E.R. STONE, d/b/a E.R. Stone Heavy Equipment Company, Plaintiff-Appellee, v. THE CITY OF ARCOLA, Defendant-Appellant and Counterplaintiff-Appellant (The First National Bank of Arcola, Defendant; E.R. Stone, d/b/a E.R. Stone Heavy Equipment Company, *et al.*, Counterdefendants-Appellees).

Fourth District   No. 4—88—0627

Opinion filed March 31, 1989.

514

Emerson L. Moore, of Lemna, Moore & Carroll, of Tuscola, for appellant.

William A. Sunderman and Brian L. Bower, both of Brainard, Bower & Kramer, of Charleston, for appellee.

JUSTICE SPITZ delivered the opinion of the court:

This action was brought by plaintiff E.R. Stone, d/b/a Stone Heavy Equipment Company, against defendant City of Arcola (City) to recover monies held by defendant which plaintiff claims to be due to plaintiff under a construction contract. Plaintiff's two-count complaint alleges breach of contract (count I) and equitable restitution based on a theory of unjust enrichment and implied contract (count II).

Defendant counterclaimed to recover damages caused by plaintiff's delay in completing the contract and failure to perform all work required by the contract. Following a bench trial conducted in the circuit court of Douglas County, judgment was entered in favor of plaintiff and against defendant on both the complaint and counterclaim.

Plaintiff is a contractor engaged in the construction of public utilities. Plaintiff submitted a $1,273,000 bid to construct a portion of defendant's new sanitary sewage facility. Plaintiff's bid was accepted on July 6, 1981, and plaintiff signed the acceptance of notice of the award on July 20, 1981.

The agreement provided that plaintiff would commence work within 10 calendar days after the date of the notice to proceed and would complete the same within 365 calendar days unless the period for completion was extended. After Stone submitted a performance bond and a payment bond, defendant issued a notice to proceed which designated the date of completion of all work as July 20, 1982. However, on the copy of the notice to proceed that was received by plaintiff, the date of completion of the work was changed to read July 30, 1982. Stone did not change the completion date on the notice to proceed which was included with the copy of his contract documents, and the trial court specifically found that no evidence was submitted to explain this discrepancy.

At the hearing, Stone testified the work immediately fell behind schedule because of rain that started on August 10. By a letter to defendant's mayor, Jack Chaney, dated September 3, 1981, Stone asked defendant to consider an extension of the construction and completion date because "August has been an abnormally wet month." Stone does not recall ever receiving any response to his letter.

Thereafter, the work continued behind schedule on the project. After a work stoppage for the winter, plaintiff started pumping water from the lagoons into a road ditch. Stone testified that in early April he had a conversation with Chaney in which the mayor told him that complaints were being received from a farmer about drainage from the lagoon site flooding his field. The farmer was concerned about his crop and asked that the pumping cease. After this conversation, plaintiff stopped pumping water from the lagoons and proceeded to lay an outfall sewer from the sewer plant. This sewer was part of the contract, but now had to be completed out of sequence. Plaintiff resumed pumping water from the lagoons into the outfall sewer on April 20, 1982.

Chaney, when called as an adverse witness, initially denied he ever went to the plant site and instructed Stone to cease pumping water. Chaney did recall going to the site and talking with Stone on one occasion and asking his cooperation on some matter but Chaney had no recollection of the exact conversation. Chaney further stated he had no authority to tell Stone to stop doing anything. Under further examination, Chaney did recall asking Stone that he cooperate by not

pumping water into the ditch and causing a problem for the City downstream.

Stone also testified there were some difficulties resulting from variations from the plans and the actual way the facility had to be constructed. These conflicts specifically involved elevations for the structures, dimensions on the building, and piping. There were contradictions in the paint and finish specifications for the clarifier, and changes were made with regard to the control building and the chemical feed location. Stone worked out these problems with the engineers in the field. According to his testimony, sometimes small items are just negotiated or trade-offs are made. However, Stone felt that this particular job contained more contradictions than usual and he sustained some delays as a result of resolving contradictions. Plaintiff's expert, Michael Murphy, testified the contradictions in the plans, in his opinion, caused somewhere between 35 to 60 days' delay.

James B. Upchurch, engineer for defendant on this project, testified there were several field adjustments made during the period of construction. He stated field adjustments are made in every type of construction project. Specifically, Upchurch testified there was a field adjustment made in connection with the floor of the first clarifier which resulted because the concrete used did not pass specifications. Consequently, Upchurch let plaintiff add an extra four inches of concrete to the top of the base so that he did not have to tear out the old base. There were also some bad concrete reports on the floor of the building at the old plant. Since he did not think this was significant, he did not require anything to be done. He determined concrete footings for the sludge drying beds were not necessary and, even though these footings were shown on the original plans and specifications, plaintiff was allowed to dispense with pouring these footings. At least 60 days were saved by not having to replace the bad concrete on the first clarifier, one week by not having to replace any of the bad concrete in the maintenance building at the old treatment plant, and two or three days by not having to put footings in some of the sludge drying beds. Other minor field adjustments were made on the project, but most of the field adjustments were made as a result of requests from plaintiff to facilitate the work.

Stone sent a letter to Chaney dated July 2, 1982, which referred to his letter of September 1981 and stated there had not been a sufficient number of favorable days or conditions to reestablish the original schedule and completion date. Therefore, plaintiff requested the completion date be extended 90 days. Chaney responded with a letter dated August 2, 1982, approving a 60-day extension of time from July

19, 1982, to and including September 17, 1982, for completion of the work. This letter stated defendant would take the necessary steps to enforce the contract, including the provision for liquidated damages in the amount of $200 per day for each day beyond September 17, 1982, the work remained uncompleted. The letter further stated the city council had reviewed plaintiff's request and had determined there had been an abnormally large amount of rainfall during the term of the contract which had been a condition beyond plaintiff's control within the meaning of section 15 of the general conditions of the contract.

On September 18, 1982, Stone mailed a letter to Chaney referring to the previous letters and reviewing the request for a 90-day extension. Stone did not recall receiving any correspondence with regard to that request but testified he knew it was denied. Stone did not make any further written requests for an extension of time. He did appear before the city council at a meeting in early February of 1983, explained to the council the situation and tried to describe the events leading up to the current status of the job. Stone then orally requested a time extension. Stone was not certain as to what action was taken that night by the council, but he did not receive any extension of time. He also had a conversation with one of Upchurch's associates asking to have a time extension. In another conversation, it was indicated to Stone by Upchurch that any discussion about an extension of time was almost pointless.

Plaintiff's expert witness, Michael Murphy, is a construction management consultant with a degree in civil engineering. Murphy does consulting work for American States Insurance Company, the surety on Stone's performance and payment bonds. In Murphy's opinion, weather was a significant factor in delaying the completion of the project. However, he indicated that under the then existing weather conditions, it would have been possible to complete the project although it would have been "very tight." In response to a subsequent question as to whether the job could be completed within 365 days of August 1, 1981, Murphy responded: "I guess nothing is impossible with enough money. Certainly would have been unreasonable or nearly impossible to have completed it within the 365 days." Even with the 60-day extension, it was not possible, according to Murphy, to complete the project on time. In his opinion, there was a 14- to 16-month delay due to inclement weather.

On cross-examination, Murphy conceded his information as to specific rainfall amounts for the construction site was climatological data put out by the National Oceanic and Atmospheric Administration which included precipitation amounts for the closest reporting station

in Tuscola, Illinois. These records showed a departure from normal rainfall for the months of September through December 1981, as follows: .47 inches less than normal for September; 1.01 inches less than normal for October; 1.76 inches less than normal for November; and .59 inches above normal for December. However, Murphy explained the number of days it actually rained and the times of day it rained are more important than total amounts of rainfall. In ascertaining this information he relied on Stone's daily notes even though these notes did not state amounts of rainfall.

Based on Murphy's review of the plans and specifications of the job and based upon his review of the engineering data from the parties, he formed an opinion that the lagoon aeration system was 100% complete on October 10, 1983, and the entire plant was substantially completed in early December 1983. He explained that the entire lagoon aeration system was able to be used for the purpose for which it was intended on October 10, 1983. However, the outfall chlorine system was not totally operational at that point and the chlorine system and alum system were not operational, but became operational in early December. He further explained the diversion of the sewage from the old treatment plant to the lagoon system in October of 1983 benefited both plaintiff, who needed to protect the aeration pipes from freezing with a minimum of two feet of water over them during the winter, and defendant, since defendant obviously needed this plant and it was already much later than defendant expected to have the plant on line.

According to Upchurch, the project was 95% complete in October of 1983 at the time the waste water was diverted from the old plant to the new sewage treatment plant. The major things left to be completed when Upchurch viewed the plant in October of 1983 were the chlorine facility, the flow meters, and a whole group of miscellaneous items which were reflected on subsequent lists. The chlorine system and the flow meters were completed around April 2, 1984.

Stone testified the existing sewer line at the old plant was tapped on October 10, 1983, and the sewage was pumped to the lagoons of the new plant. He made a written request to defendant to take over the operation of the plant, but he does not recall receiving a response to that letter, dated February 3, 1984. The letter advised that all systems were operational with the exception of the metering equipment which would be covered under a separate letter.

Plaintiff operated the plant for 210 days from October 10, 1983, to the date that the City took over the operation of the plant. During this period, there would have been about 200 days that equipment

would have been serviced at the site. One of plaintiff's employees spent an average of one hour per day performing his duties in the operation of the sewage treatment plant. Plaintiff's employees were paid $20 per hour. In addition, during the time plaintiff operated the plant, plaintiff paid to Central Illinois Public Service Company (CIPS) $5,739.02 for electric bills. Stone did not ask defendant to reimburse him for the electrical expenses, but did request defendant to take over operation of the plant after he had put it in operation. While operating the plant, 48 man-hours were expended in cleaning the sand filters at the rate of $20 per hour.

Five written change orders were made in connection with this project. The first change order was dated August 2, 1982, and granted plaintiff the 60-calendar-day extension to complete the work. The other four change orders were dated August 1, 1983, October 3, 1983, May 7, 1984, and January 24, 1985. These change orders did not extend the contract time, but did increase the contract price by a total of $34,185. Three of these change orders occurred during the time defendant was retaining liquidated damages for plaintiff's delay in completing the contract. One of the change orders resulted from a request by plaintiff. The two change orders dated prior to May of 1984 were requested by defendant and one of these was for the construction of a metal storage building, a project actually performed by a subcontractor selected by defendant and which was merely tied to plaintiff's contract. Plaintiff was to receive a percentage for including this building in his contract.

A certificate of substantial completion dated April 2, 1984, was delivered to plaintiff with an April 3, 1984, letter from Upchurch's associate, Tony Harrell. Also attached to this letter was a clarification agreement as to assessment of liquidated damages and a list of items to be completed, dated March 25, 1984. The substantial completion certificate specified that it applied to all the work except for the storage building in the change order dated October 3, 1983, and lift station No. 1 magnetic flow meter. Stone consulted with an attorney concerning the substantial completion certificate. He then received a letter from defendant dated April 16, 1984, which indicated that upon signing the certificate of substantial completion evidencing an acceptance thereof, defendant would assume the responsibilities of operation, maintenance, heat and utilities for the facility, security and safety, and insurance associated with the operation of the facility. Plaintiff's acceptance of the certificate was dated April 17, 1984, but it was not delivered to defendant's engineers until May 21, 1984.

After the issuance of the substantial completion certificate,

defendant made five written requests to plaintiff with regard to work defendant insisted still needed to be completed under plaintiff's contract or under the one-year contract guarantee period. These letters were dated July 10, 1984, August 7, 1984, November 15, 1984, January 4, 1985, and January 4, 1985. Although Stone disputed whether he was required to complete some of these items, he conceded that there were some he did not complete. There was one last list dated February 26, 1985, delivered to plaintiff. Defendant thereafter wrote a letter to plaintiff dated March 4, 1985, sending a copy to American States, which advised plaintiff and American States that, pursuant to paragraph 18 of the general conditions of the contract, his services under the contract would be terminated within 10 days from the receipt of the letter and stated the reasons therefor. Upchurch then prepared three separate sets of bid specifications to complete this work the City claimed was left unfinished under plaintiff's contract. C & R Construction Company submitted a bid on each one of these proposals, performed the work and was paid $5,715 by defendant. In addition, there were repairs done on two flow meters which were a part of plaintiff's original contract. Upchurch explained there were no bids taken on the repairs of the flow meters, since Sparling Instrument Company, the manufacturer of the flow meters, did the repairs at a cost to defendant of $3,557.78. In addition, Upchurch testified the reasonable and customary value for his services which were rendered after March 16, 1985, to defendant in connection with the final completion of the project was $2,483.14. An itemized statement of those services was received in evidence.

Plaintiff's bid for this project was made on the bid form provided by defendant and contained the following provision:

> "BIDDER hereby agrees to commence WORK under this contract on or before a date to be specified in the NOTICE TO PROCEED and to fully complete the PROJECT within 365 consecutive calendar days hereafter. BIDDER further agrees to pay as liquidated damages, the sum of $200 for each consecutive calendar day thereafter as provided in Section 15 of the General Conditions."

Section 15 of the "General Conditions" provides in part as follows:

> "15. TIME FOR COMPLETION AND LIQUIDATED DAMAGES.
>
> 15.1 The date of beginning and the time for completion of the WORK are essential conditions of the CONTRACT DOCUMENTS and the WORK embraced shall be commenced on a date specified in the NOTICE TO PROCEED.

15.2 The CONTRACTOR will proceed with the WORK at such rate of progress to insure full completion within the CONTRACT TIME. It is expressly understood and agreed by and between the CONTRACTOR and the OWNER, that the CONTRACT TIME for the completion of the WORK described herein is a reasonable time, taking into consideration the average climatic and economic conditions and other factors prevailing in the locality of the WORK.

15.3 If the CONTRACTOR shall fail to complete the WORK within the CONTRACT TIME or extension of time granted by the OWNER, then the CONTRACTOR will pay to the OWNER the amount for liquidated damages as specified in the BID for each calendar day that the CONTRACTOR shall be in default after the time stipulated in the CONTRACT DOCUMENTS.

15.4 The CONTRACTOR shall not be charged with liquidated damages or any excess cost when the delay in completion of the WORK is due to the following, and the CONTRACTOR has promptly given WRITTEN NOTICE of such delay to the OWNER or ENGINEER.

15.4.1 To any preference, priority or allocation order duly issued by the OWNER.

15.4.2 To unforeseeable causes beyond the control and without the fault or negligence of the CONTRACTOR, including but not restricted to, acts of God, or of the public enemy, acts of the OWNER, acts of another CONTRACTOR in the performance of a contract with the OWNER, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and abnormal and unforeseeable weather * * *."

Defendant arrived at the $200-per-day figure for liquidated damages after it was discussed at a council meeting at which Upchurch was present. There was a discussion at the council meeting of the cost concerning engineering per day and the cost of operating the old plant. Upchurch testified "we wanted to hold the liquidated damages down as much as possible, because we didn't want the contractor to raise his price any, because if he knows he may have to pay a higher price he may bid more. So, we wanted to hold it just to what we thought the damages would be." Upchurch also provided the council with information from the Illinois Department of Transportation (DOT), Standard Specifications for Road and Bridge, which suggests liquidated damages be set at $200 per day on a $1 million to $2 million project and this suggestion was a factor in setting the liquidated damages at $200. Upchurch had no idea at the time the contract was

signed what the actual damages to defendant would be. However, the additional engineering costs as a result of the delay were between $60,000 to $70,000. Making sure the contractor moved along on the job was not one of the factors considered in setting liquidated damages at $200 per day. Upchurch advised the council there would be additional engineering charges if an extension was granted since Upchurch's contract with defendant was for the construction period and any time beyond that construction period would cause the cost of engineering to increase. At the time the contract was entered into, the resident engineer on the job was being paid $25 per hour and he would work approximately nine hours per day and normally five days per week.

Chaney did not remember the exact discussion by the city council at the meeting on which the $200-per-day liquidated damages amount was set. He testified the inclusion of liquidated damages in the contract "could" affect the contracts in such a way as to move the project along. Chaney admitted defendant was prohibited from adding any new customers and from expanding any sewer lines to bring in new housing developments and new industry at the time this contract was entered into, and for the prior year and one-half or more. Defendant was required to have the new plant completed and operating before the ban would be terminated. However, Chaney admitted, at the time the contract with plaintiff was entered into, there was an industrial park located about one-half mile south of the proposed sewer plant, but there was no sewer main running to the industrial park in July of 1981. Since May 24, 1984, there has been quite a bit of development in this industrial park.

Upchurch, in explaining the ban which went into effect around 1978, stated defendant could not extend any sewers beyond their present limits and only buildings with a population of less than 15 were allowed to hook up to the existing sewer lines. Defendant had to increase its capacity to treat sewage before it could get off of the ban. In defendant's situation, this meant defendant had to build a new sewage treatment plant.

The first issues to be considered concern liquidated damages. Did the trial court incorrectly determine that, as a matter of law, the liquidated damages provision was unenforceable? In the alternative, if the liquidated damages provision was enforceable, was the trial court's decision in favor of plaintiff against the manifest weight of the evidence?

■ In its order, the trial court specifically found, as a matter of law, the liquidated damages provision was unenforceable because (1) it

had no basis in any reasonable estimate of actual damage and (2) it was a penalty. The law concerning the enforceability of liquidated damages provisions has been generally summarized in *Arduini v. Board of Education, Pontiac Township High School, District 90* (1981), 93 Ill. App. 3d 925, 931, 418 N.E.2d 104, 108-09, *rev'd* (1982), 92 Ill. 2d 197, 441 N.E.2d 73 (holding that the party against whom the liquidated damages provision was sought to be imposed had not accepted the contract and therefore could not be bound by the provision):

> "If defendant had the authority to pursue a breach of contract action, then it necessarily follows that it had the authority to liquidate damages in advance. The liquidated damages provision, of course, must conform to the requirements Illinois courts have laid down for testing the validity of such contract terms. If the provision is in fact a penalty imposed upon a party to compel performance of a contract rather than a term giving compensatory damages to the nonbreaching party, then it is unenforceable. (*Scofield v. Tompkins* (1880), 95 Ill. 190; *Heckmann v. Mid States Development Co.* (1965), 60 Ill. App. 2d 113, 207 N.E.2d 715.) In *Bauer v. Sawyer* (1956), 8 Ill. 2d 351, 359, 134 N.E.2d 329, 333, our supreme court quoted Restatement of Contracts §339(I) (1932), as a declaration of the requirements a party must meet in order to show that a contractual provision is for liquidated damages and is not a penalty:
>
> > ' "An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation." '
>
> Courts also require that the parties have shown an intent to agree in advance to settle damages for a breach. (*Curtin v. Ogborn* (1979), 75 Ill. App. 3d 549, 394 N.E.2d 593.) Further, the court in *Builder's Concrete Co. v. Fred Faubel & Sons, Inc.* (1978), 58 Ill. App. 3d 100, 107, 373 N.E.2d 863, 869, said, 'The damages provided must be a specified amount for a specific breach to be paid as an alternative to performance and not as a penalty for nonperformance.' "

In addition, a liquidated damages clause will only be given effect if it is difficult to determine actual damages. *Hayden v. Keepper-Nagel,*

*Inc.* (1978), 62 Ill. App. 3d 828, 379 N.E.2d 116.

■ In this case, liquidated damages were set at $200 per day. Defendant arrived at this figure after considering the DOT standards utilized in road and bridge construction, and the additional engineering costs for the resident engineer at $25 per hour, 9 hours per day, 5 days per week. Upchurch testified the amount of liquidated damages was kept low to avoid receiving high bids and the liquidated damages clause was not designed to spur the contractor to comply with the construction deadline.

Chaney testified that, until the new sewage treatment facility was completed and operating, defendant was barred from expanding sewer lines, which impeded the growth of the community. However, plaintiff hangs his hat on the testimony by Chaney, arguing that he testified the liquidated damages clause was an incentive to complete the project on time. But Chaney did not testify that such was the purpose or intent of defendant in adopting the $200-per-day liquidated damages provision. He merely stated it "could" have that effect. Lastly, by bidding on the project knowing of the liquidated damages provision, plaintiff accepted same.

As a matter of law, this is an appropriate and enforceable liquidated damages provision. It would be difficult to determine the damages to defendant resulting from not being able to bring in industry and large residential units. The additional cost for engineering alone was $225 per day, but the defendant decided to keep the liquidated damages provision low so as not to encourage contractors to increase the bids. This certainly seems like a reasonable forecast of just compensation. Nor should this provision be construed as a penalty. Certainly a liquidated damages clause "could" have the effect of urging timely compliance with the contract, but it ought not be considered a penalty unless that was the purpose for including a liquidated damages provision. In this case, the testimony does not establish, as a matter of law, that penalizing a contractor for delay was the reason to include the punitive damages clause in the contract.

■ The next consideration, however, is whether the trial court's findings of excused delay in performance are against the manifest weight of the evidence. The court specifically found inconsistencies and contradictions in the specifications caused delays of 35 to 60 days, defendant caused further delay by requesting plaintiff discontinue pumping water into a ditch, thereby requiring plaintiff to complete outfall sewer piping out of sequence, and there were unforeseeable and abnormal weather conditions which caused excusable delay. The court also found that, even though defendant granted a 60-day exten-

sion, there was no indication the 60 days had any relationship to the weather conditions in the fall of 1981 and the spring of 1982. In addition, the court found the lagoon and aeration system was substantially complete on October 10, 1983, meaning it could be used for the purpose for which it was intended on that date. Only "the chlorine and alum aspects" were not complete, and they became operational shortly thereafter. According to the trial court's findings, a 14- to 15-month excusable delay was caused due to unforeseeable and abnormal weather.

The original completion date for the project was July 30, 1982 (10 days after the notice to proceed plus 365 days). So the actual delay, from July 30, 1982, to October 10, 1983, was 14 months, 10 days. Even if we assume for the sake of argument that the trial court ruled incorrectly as to the waiver of liquidated damages provision by defendant, it would seem the trial court could reasonably find the delays to be caused by inclement weather or the action of defendant based on the evidence.

The liquidated damages clause expressly excludes delays from "unforeseeable causes beyond the control and without the fault or negligence of" plaintiff, including abnormal and unforeseeable weather. It also expressly excludes delays caused by acts of the defendant. If the court found the defendant should have assumed operation of the new plant on October 10, 1983, then no delay was attributable to plaintiff such that the liquidated damages provision would be enforceable. Only if the defendant properly refused to undertake operation of the plant until May 22, 1984, would the trial court, in order to avoid awarding liquidated damages, need to also find defendant waived the equitable damages provision.

Defendant suggests that had plaintiff wanted to avoid being charged for liquidated damages, plaintiff should have utilized the general conditions requiring written notice. However, it is possible for the written notice requirement to have been orally waived by defendant. (*Custom Builders, Inc. v. Clemons* (1977), 52 Ill. App. 3d 399, 367 N.E.2d 537; *Atlee Electric Co. v. Johnson Construction Co.* (1973), 14 Ill. App. 3d 716, 303 N.E.2d 192.) Furthermore, the failure of plaintiff to give written notice of the delay may be considered a waiver of a claim for delay, but "the waiver of a claim for delay does not correspondingly dictate that the party waiving the delay be held liable for the delay." (Ryan & Diestler, *Procedures & Preparations of Proof for Damage Claims Based on Construction Delays & Failures*, in Construction Litigation ch. 3, §3.16, at 3—20 (Ill. Inst. for Cont. Legal Educ. 1984).) In addition, defendant's agent, Upchurch, indicated to

plaintiff any further requests for delay were useless. While that may not have excused plaintiff from giving written notice of the delay, it does indicate defendant had actual knowledge of the claim. "A contractor may be held to have waived his claim, absent written notice [of delay], unless the owner had actual knowledge of the claim." Ryan & Diestler, *Procedures & Preparations of Proof for Damage Claims Based on Construction Delays & Failures*, in Construction Litigation ch. 3, §3.16, at 3—20 (Ill. Inst. for Cont. Legal Educ. 1984).

So plaintiff did not waive his right to claim the delays. Furthermore, we need not consider whether defendant waived the liquidated damages provision since it is reasonable for the court to find the project to be substantially completed on October 10, 1983.

Substantial compliance of a construction contract was discussed in *George Butkovich & Sons, Inc. v. State Bank* (1978), 62 Ill. App. 3d 810, 811-12, 379 N.E.2d 837, 838:

> "The ordinary rule applied in cases involving building contracts is that a builder is not required to perform perfectly, but rather, he is held only to a duty of substantial performance in a workmanlike manner. (*Watson Lumber Co. v. Guennewig* (1967), 79 Ill. App. 2d 377, 226 N.E.2d 270.) The purchaser who receives substantial performance of the building contract must pay the contract price less a credit as compensation for any deficiencies existing in what he received as to what strict performance would have given him. *J-M Builders v. McIntyre* (1978), 56 Ill. App. 3d 714, 372 N.E.2d 420.
>
> On the other hand, a contractor whose work amounts to less than substantial performance has no right to the contract price; in that situation, the builder's right is, under a theory of quantum meruit, a right to recover only reasonable compensation for value received by the purchaser over and above the injury suffered by the builder's breach. (*Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668, 356 N.E.2d 565.) What will be considered substantial performance of a building contract is difficult to define and whether substantial performance has been given will depend on the relevant facts of each case. (*Brewer v. Custom Builders Corp.*)"

The trial court found substantial completion on October 10, 1983. Since the project was sufficiently complete at that time to be used for the purpose for which it was intended, then it would seem appropriate to construe the liquidated damages provision to close at the time of substantial compliance, even though there may be minor repairs, adjustments, or finishing work remaining. After all, if the contractor

can get paid at substantial compliance, that is the logical time to discontinue the applicability of the liquidated damages clause. If the contractor fails to complete the additional work, the owner's remedy is to have someone else complete it and sue the contractor to recover the expense.

As to all fact questions, the trial court is in a better position than is the reviewing court to assess witness credibility and to weigh the evidence since the trial court observed the witnesses as they testified. Therefore unless the trial court's decision is against the manifest weight of the evidence, which means the opposite result is clearly evident, a reviewing court will not overturn the trial court's findings of fact and the judgment. (*Acosta v. Chicago Transit Authority* (1976), 39 Ill. App. 3d 80, 349 N.E.2d 613.) Here the opposite conclusion is not clearly evident, and the court's ruling should stand.

We next consider the issue of whether the trial court erred in granting recovery to plaintiff on an unjust enrichment theory since the existence of an express contract negates the existence of a contract implied in law. In the alternative, defendant argues that the trial court's determination in favor of plaintiff was against the manifest weight of the evidence.

On this issue, defendant contends the operation of the sewage plant by plaintiff from October 10, 1983, to May 22, 1984, was an "extra" governed by that portion of the express, written contract which delineates how plaintiff was to be recompensed for additional expenses not covered in the specifications. Plaintiff states this operation is not an "extra" and concludes this is a separate, implied contract which may be enforced.

■ This court has recently dealt with the relationship of express and implied contracts in *City of Marshall v. City of Casey* (1989), 177 Ill. App. 3d 1065. The court need not resort to implying a contract where an express contract exists between the same parties *on the same subject matter*. If the subject matters are different, then certainly there may be an enforceable contract in addition to an express contract.

■ The contract in this case does not refer to "extras." One of the contract documents referred to in the defendant's acceptance of plaintiff's bid is a document referred to as "General Conditions." Included in the general conditions are the following paragraphs:

"13. CHANGES IN THE WORK

13.1 The OWNER may at any time, as the need arises order changes within the scope of the WORK without invalidating the Agreement. If such changes increase or decrease the

amount of time required for performance of the WORK, an equitable adjustment shall be authorized by CHANGE ORDER.

13.2 The ENGINEER, also, may at any time, by issuing a FIELD ORDER, make changes in the details of the WORK. The CONTRACTOR shall proceed with the performance of any changes in the WORK so ordered by the ENGINEER unless the CONTRACTOR believes that such FIELD ORDER entitles him to a change in CONTRACT PRICE or TIME, or both, in which event he shall give the ENGINEER WRITTEN NOTICE thereof within seven (7) days after the receipt of the ordered change. Thereafter the CONTRACTOR shall document the basis for the change in CONTRACT PRICE or TIME within thirty (30) days. The CONTRACTOR shall not execute such changes pending the receipt of an executed CHANGE ORDER or further instruction from the OWNER.

14. CHANGES IN CONTRACT PRICE

14.1 The CONTRACT PRICE may be changed only by a CHANGE ORDER. The value of any WORK covered by a CHANGE ORDER or of any claim for increase or decrease in the CONTRACT PRICE shall be determined by one or more of the following methods in the order of precedence listed below:

    (a)  Unit prices previously approved.

    (b)  An agreed lump sum.

    (c)  The actual cost for labor, direct overhead, materials, supplies, equipment, and other services necessary to complete the work. In addition there shall be added an amount to be agreed upon but not to exceed fifteen (15) percent of the actual cost of the WORK to cover the cost of general overhead and profit."

Defendant argues that general condition 14 is the governing provision here. However, defendant does not point to any provision in the contract which contemplates, as between plaintiff and defendant, the operation of the facility prior to completion. Therefore, it is logical that the changes referred to in the general conditions mean changes in construction specifications, not the operation of the plant. Since the operation of the plant is a subject matter different and distinct from the construction of the plant, an implied contract concerning the plant's operation can be enforced even though an express contract exists concerning plant construction.

    ■ In defendant's reply brief, defendant argues that liability on an implied contract cannot be imposed on a municipality, citing *South Suburban Safeway Lines, Inc. v. Regional Transportation Authority*

(1988), 166 Ill. App. 3d 361, 519 N.E.2d 1005. Because this contention was raised for the first time in the reply brief, it need not be considered. (*Hall v. Humphrey-Lake Corp.* (1975), 29 Ill. App. 3d 956, 331 N.E.2d 365.) Furthermore, *South Suburban* holds that a contract cannot be implied to a municipal corporation where the implied contract would be *ultra vires*, contrary to statutes or charter provisions, or contrary to public policy. This implied contract is not contrary to public policy, and defendant fails to point to any statutes or charter provisions which prohibit it or to explain in what way the city officials and engineers would be exceeding their authority had they expressly agreed to have plaintiff approve the plant. Therefore, we find not only that the argument was inappropriately raised for the first time in the reply brief, but also that it is unpersuasive.

█■█ The next issue to be considered is whether the trial court's denial of the counterclaim was against the manifest weight of the evidence.

In its order, the trial court found:

"36. That there is no evidence that the 'finishing up' projects as contained in Defendant's Exhibits Nos. 13, 16, 17, 18, 19 and 20 were necessary to complete the original contract, that these items were covered under any warranty or that the estimate sheets as set forth in Defendant's Exhibit Nos. 16, 17 and 20 were reasonable or were in any way related to the sums that were stipulated to be paid."

The testimony in this case is to the effect that after the contract between the parties was terminated on March 16, 1985, Upchurch inspected and determined there was work which remained undone. Thereafter, bids were taken for this work, and the work was done by C & R Construction Company at a cost of $5,715. In addition, there were $3,557.78 paid by defendant to repair two flow meters and $2,483.14 for services of the engineers in relation to the above work.

Upchurch testified that exhibits 21 through 26 contain work which was not completed and which work was included in his bid specification. Defendant's exhibits 21 through 26 are a series of letters by Upchurch to plaintiff demanding certain work be done.

As the court found, however, there is no testimony which relates the work items to any contract provisions or warranties. No witness directs the court's attention to the contractual provisions which require plaintiff to do this work.

Although after a bench trial, a reviewing court will review the facts as well as the law, the judgment of the trial court will only be set aside if it is demonstrated that the judgment is against the mani-

fest weight of the evidence, which means it is clearly evident that a conclusion opposite to that reached by the trial court was the proper disposition. (*First Security Bank v. Bawoll* (1983), 120 Ill. App. 3d 787, 458 N.E.2d 193; *Elgin Lumber & Supply Co. v. Malenius* (1967), 90 Ill. App. 2d 90, 232 N.E.2d 319.) In this case, the opposite conclusion is not clearly evident, and therefore, the trial court's denial of the counterclaim is affirmed.

Next, we consider whether this is an appropriate case for the trial court to award prejudgment interest. The statute provides several grounds for awarding prejudgment interest. Section 2 of "An Act in relation to the rate of interest and other charges in connection with sales on credit and the lending of money" states:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance [;] on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment." (Ill. Rev. Stat. 1987, ch. 17, par. 6402.)

The trial court specifically found that plaintiff could recover prejudgment interest based on monies due on a written instrument and further stated that such recovery is *not* based on unreasonable and vexatious delay of payment.

Defendant's argument relies on *Roy Strom Excavating & Grading Co. v. Miller-Davis Co.* (1986), 149 Ill. App. 3d 1093, 501 N.E.2d 717, which reversed a trial court's award of prejudgment interest because the withholding of monies was based on a good-faith belief it was owed due to delays in the project attributable to plaintiff. The *Roy Strom Excavating* case does not state which ground of the statute was relied on by the trial court, but the rationale of the appellate court relies on two prior cases, *General Dynamics Corp. v. Zion State Bank & Trust Co.* (1981), 86 Ill. 2d 135, 427 N.E.2d 131, and *Watson Lumber Co. v. Guennewig* (1967), 79 Ill. App. 2d 377, 226 N.E.2d 270. Both cases involved construction contracts. However, *General Dynamics* specifically points out that the trial court found "no unreasonable and vexatious delay," and therefore the court considered the defendant's "good faith" in withholding the monies. (*General Dynamics*, 86 Ill. 2d at 140, 427 N.E.2d at 133.) *Watson Lumber*, also quoted in *General Dynamics*, found that there existed between the

parties a genuine and substantial dispute such that the withholding of funds was in good faith and was not an unreasonable or vexatious delay.

However, Illinois courts have long held that breach of a construction contract can form the basis for awarding prejudgment interest because such a contract is an "instrument in writing." (*McDonald v. J.W. Patterson & Co.* (1900), 186 Ill. 381, 57 N.E. 1027; *Keeler v. Herr* (1895), 157 Ill. 57, 41 N.E. 750; *Heiman v. Schroeder* (1874), 74 Ill. 158.) According to one court, where a debtor-creditor relationship exists on a written instrument, there is no need to prove vexatious and unreasonable delay and, therefore, good faith is no defense. All that is required is that the money due be a liquidated amount or subject to easy computation. (*John Kubinski & Sons, Inc. v. Dockside Development Corp.* (1975), 33 Ill. App. 3d 1015, 339 N.E.2d 529; see also *Phelps v. O'Malley* (1987), 159 Ill. App. 3d 214, 511 N.E.3d 974, *appeal denied* (1987), 117 Ill. 2d 553, 517 N.E.2d 1095.) Such is the case at bar. Good faith is not a defense if the basis for granting prejudgment relief is that a liquidated amount is due under a written contract, such as a contract for the sale of goods. (*Servbest Foods, Inc. v. Emessee Industries, Inc.* (1980), 82 Ill. App. 3d 662, 403 N.E.2d 1.) Therefore, it would seem logical that good faith would also not be a defense in the case at bar, where prejudgment interest is awarded based on the other written instrument clause of the statute. The awarding of prejudgment interest is affirmed.

The final issue to be considered is whether the trial court's determination that plaintiff was entitled to be paid $6,300 for monies retained by defendant in addition to liquidated damages was against the manifest weight of the evidence. Defendant concedes the trial court need make no special finding of fact to support its judgment, although it may be a better practice (see *Long v. Arthur Rubloff & Co.* (1975), 27 Ill. App. 3d 1013, 327 N.E.2d 346), but argues there is absolutely no evidence in the record supporting the $6,300 award. However, in opening statement, defendant's trial counsel did admit, "Now, the City has retained liquidated damages and actually, according to the counterclaim, we have also withheld in payments $6,338." Since clear admission of a material fact in opening statement is binding on the party whose attorney made that admission (*Standard Management Realty Co. v. Johnson* (1987), 157 Ill. App. 3d 919, 510 N.E.2d 986), no additional evidence needed to be presented. The trial court found plaintiff completed the project and, as already discussed, that the items defendant claims to be left undone were not shown to be part of the original contract or any warranty. Clearly, the award to

plaintiff of $6,300 representing the amount retained by defendant on the contract price is not against the manifest weight of the evidence.

In its reply brief, defendant contends the statement by counsel is merely a repetition of the allegation and is not an admission of a material fact. Defendant also argues that since plaintiff never sought the return of this money in the complaint, plaintiff cannot now recover.

Defendant's counterclaim *admits* the money was withheld. And the trial court, in denying defendant's counterclaim, found defendant wrongfully withheld the money. Clearly, the trial court had the authority to order the monies wrongfully withheld by defendant to be paid to plaintiff. The discrepancy between the amount admittedly withheld ($6,338) and the amount ordered paid ($6,300) appears to be a clerical error of no significance to a determination of the propriety of the court's ruling.

For the foregoing reasons, the judgment of the circuit court of Douglas County is affirmed.

Affirmed.

McCULLOUGH, P.J., and KNECHT, J., concur.