*In re* J.P. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Velma Hunt, Respondent-Appellant).

Fourth District   No. 4—93—0722

Opinion filed April 7, 1994.

Barbara L. Delanois, of Davis & Moore, of Danville, for appellant.

Michael D. Clary, State's Attorney, of Danville (Norbert J. Goetten, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Theodore J. Pasierb, of Danville, guardian *ad litem.*

JUSTICE LUND delivered the opinion of the court:

Respondent Velma Hunt appeals from an order of the circuit court of Vermilion County which found her to be an unfit parent and terminated her parental rights to her two minor children. We affirm.

On September 19, 1990, petitions for adjudication of wardship were filed, alleging that J.P. and H.N. were abused and neglected minors. At the time, J.P. was five years of age and H.N. was almost 20 months. The petitions alleged that respondent had twisted J.P.'s arm as a means of punishment, she had stabbed one Benny Newsome in the presence of J.P. and H.N., and she had threatened a representative of the Illinois Department of Children and Family Services (DCFS) with a knife in J.P.'s presence. It was also alleged that respondent had left both children at home on September 17, 1990, for the entire day without having fed them and without telling them where she would be. The petitions asked for an adjudication of wardship under section 2—3 of the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1989, ch. 37, par. 802—3). After a hearing on October 26, 1990, the trial court made findings of neglect and abuse as to both minors. On March 11, 1991, the court placed custody of the children with DCFS.

A social history report was filed with the court on January 4, 1991. This report indicated that DCFS had a long history of involvement with respondent, from age 16. After having difficulty at home, she was placed in several foster homes. A school report at that time described her as being trainable mentally handicapped. DCFS again became involved with her after J.P. was born, to assist her in

learning to care for him. Her case was closed in 1987, but was reopened in 1988 and has remained open since that time due to five indicated reports of environmental neglect, inadequate supervision, inadequate clothing and risk of physical injury, respondent's lack of cooperation with the services offered to her, and lack of progress.

The State filed a petition to terminate respondent's parental rights and the parental rights of the minors' putative fathers on March 30, 1992. That petition alleged respondent was an unfit parent because she had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children from her and had failed to make reasonable progress toward return of the children to her within 12 months after they had been adjudicated neglected and abused, pursuant to section 1(D)(m) of the Adoption Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 1501(D)(m)). The petition also alleged that respondent was unable to discharge her parental responsibilities, supported by competent evidence from a psychiatrist or clinical psychologist of mental impairment, mental illness, or mental retardation as defined in section 1—116 of the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1991, ch. 91$^{1}$/2, par. 1—116) or developmental disability as defined in section 1—106 of that Code (Ill. Rev. Stat. 1991, ch. 91$^{1}$/2, par. 1—106), and there was sufficient justification to believe such inability to discharge parental responsibilities would extend beyond a reasonable time period.

Hearings on this petition were held on March 25, 1993, and May 17, 1993. The father of J.P. voluntarily surrendered his parental rights prior to commencement of the hearing. Benny Newsome, father of H.N., failed to appear and was defaulted.

Dr. Marty Traver, a clinical psychologist, testified for the State that she interviewed respondent on September 16, 1991, for one to two hours. Respondent appeared to have good insight into her situation and that she needed to cooperate in order to get her children back. She appeared depressed and expressed suicidal ideation. She reported that she had a sixth-grade education in special education and was unable to read or write. She also reported difficulty processing time, dates, and numbers and that she had people count her money for her so that she could pay her bills. Respondent told Traver she had been involved in several violent relationships with adult men and that she had had sex at age 15 with her brothers, who were ages 3 and 13. She reported visual and auditory hallucinations, such as seeing fire in her children's eyes. This was a term Dr. Traver had heard frequently from religious fundamentalists who believe that a flame of fire in the eyes is a sign that Satan has possessed the

person. Respondent told her that she thought she had demons for babies, but denied harming her children as a result of this hallucination. She also reported feeling her bedpost shake violently when she prays, seeing God in the closet, and hearing bells ringing loudly. She also reported one time seeing a large ape with a tail staring at her through a window "like from the Bible," which she thought was a sign the world was coming to an end.

Respondent also reported she was enuretic at all times and urinated in public. She related incidents of physical and sexual abuse by family members and that she had abused herself sexually as an adolescent. Respondent also reported she drank a 12-pack of beer once a week and her boyfriend getting drunk. She denied that caused her or her children any problems, although she reported being evicted from several apartments because of her boyfriend's drunken behavior. Respondent also told Traver that she could not drive, could not take the children to the grocery store, and had to wait all day for her boyfriend to bring them food. Traver also testified that respondent admitted having a problem with anger and Traver expressed the opinion that this was a reaction to respondent's perception that people have been cruel and abusive toward her.

Traver's conclusions were that respondent suffers from a psychotic disorder not otherwise specified. This means respondent is having psychotic episodes that do not meet criteria for any of the psychotic diseases contained in the DSM-III (Diagnostic & Statistical Manual of Mental Disorders III (rev. 1987)). Respondent had all the physical actions of a schizophrenic and exhibited characteristics of bipolar manic-depressive disorder, although not enough to warrant a diagnosis. Traver also concluded that respondent had a borderline personality disorder, *i.e.*, a persistent pattern of instability of mood and behavior. In this disorder, the person tends either to idealize or vilify people. Such a person would generally have an unstable work history (if any), unstable residence, multiple relationships, and would exhibit behaviors and stay in situations detrimental to him or her. Traver's conclusion that respondent was mildly mentally retarded was a clinical impression, based upon her interview with respondent and the fact she could not read, had difficulty with numbers, had a sixth-grade education in special education, and how she presented herself. Traver also stated she had evaluated many people for intellectual functioning who have not been given an intelligence quotient (IQ) test. An IQ of 55 to 70 would indicate mild mental retardation. Traver also concluded respondent had an eating disorder (not otherwise specified), based upon the fact that she was obese and neither anorexic nor bulimic.

Traver testified she believed respondent would meet the definition of both mental retardation and developmental disability. Traver believed respondent's inability to discharge her parental responsibilities would extend beyond a reasonable time period, based upon the nature of her symptoms and the fact that they first occurred in her childhood. It was the combination of the retardation with the behavior disturbances that were of concern to Traver.

Traver testified respondent exhibited no auditory or visual hallucinations during the interview. Respondent suffers from affective instability, which means her moods are not stable and no one knows how she might react to situations. This was illustrated by her threatening the DCFS worker with the knife. Diagnoses of mental retardation and personality disorder are considered to be lifelong. Having these conditions alone does not make a person unable to parent. However, in respondent's case, Traver believed she was not capable of adequately and safely parenting her children because of her behavior.

Dr. Traver recommended that respondent be seen by a psychiatrist to determine whether she would benefit from medication. She also recommended that respondent receive counseling for anger control and inappropriate social behavior. Dr. Robert Talbert, a psychiatrist, examined respondent subsequently. Dr. Traver reviewed his report and testified that his conclusions were consistent with her own. Dr. Talbert diagnosed respondent as having a borderline mental disorder, mild mental retardation, and social deprivation. Dr. Talbert stated respondent would not benefit from counseling, but he recommended a socialization program which Dr. Traver stated was consistent with her own recommendations that counseling would be advisable to learn appropriate social behavior.

Respondent testified as to a series of residences where she had lived recently, each for a period of two weeks to three months. She was homeless for a while after her children were taken away from her. Benny Newsome lived with her at one apartment, although he had been banned from the apartment complex. She was evicted because Newsome "tore up" her apartment. From there she moved to her sister's house, where the sister's boyfriend hit her, sending her to the hospital with a bruised back. Her sister forced her to leave the house, and respondent moved to a hotel. Her homemaker helped her to find an apartment. At the time of the hearing, she was living with a man named James Pitts. She receives supplemental security income (SSI) benefits of $379 per month, deposited directly in her bank account, because of a kidney problem and the fact that she cannot read. She gets confused counting change and dollar bills; however,

she does not have a protective payee. Her apartment rent on New York Street was $160. She paid her landlord with a $100 bill and six $20 bills; however, her landlord did not give her any change. She pays all bills in cash.

Respondent testified she did not recall telling Dr. Traver she had sex with her brothers. Sometimes she goes off into a "twilight zone," like she is not there—she could be daydreaming. The father of her son was abusive toward her, throwing her down the stairs when she was pregnant and giving her a black eye. He beat on her because she would not give him her money. Newsome was also abusive and drank alcohol. Despite the fact that Newsome was not supposed to continue to live with her, he did so; she asked him to leave, but he refused. Respondent denied telling Dr. Traver she saw a flame of fire in her children's eyes or any of the other hallucinations to which Traver testified, saying she was exaggerating. If she did say it, she was in a twilight zone. She has headaches and stated a doctor once told her she has a split personality. She often blacks out when this happens. Respondent understood what a service plan consists of and that she must meet its goals to regain custody of her children. She maintained she cooperated with her homemaker.

Respondent took classes to control her anger and stated she now controls it well. She missed only one visit with her children. She was unable to complete some of her goals because DCFS personnel insisted she have a protective payee before working with her to meet her goals. She refused to have a protective payee, because she felt she could handle her own money and believed a protective payee would take her money. She did not remember stabbing Newsome. She admitted she lost her food-stamp benefits for several months in 1991 because she did not show up for appointments. She denied her children had called her names or hit her during visitations. She also denied giving them money, toys, or sweets so they would behave. Respondent testified she did not know how to get to the grocery store in 1991, but she now can use the bus.

Cheryl Kreckman, DCFS child welfare specialist, testified that she made a home visit on February 5, 1991, and found respondent in bed. She conducted the home visit in respondent's bedroom and, as she was leaving, saw H.N. at the top of the stairs with a knife pointed at her face. Kreckman yelled to respondent about the knife and respondent in turn yelled at J.P. to take the knife away from H.N. Kreckman went upstairs and got the knife. Respondent never did get out of bed to correct the situation. It was after this incident that DCFS obtained custody of the children. Prior to this, there had been several indicated reports of inadequate supervision and environmental neglect and one report of physical abuse.

Kreckman testified the goals in respondent's February 1991 service plan were not met. Those goals were for respondent to cooperate with home interventionist services, protective payee services, parent education classes, and any community agencies that might assist her in developing independent living skills. Home interventionist services were cancelled in 1990 due to lack of cooperation. Respondent attended two parenting classes and was dropped from the program for nonattendance. Crosspoint Community Support Services (Crosspoint) was the main agency assisting respondent, but she did not cooperate. The overall evaluation for the February 1991 service plan was unsatisfactory.

The next service plan was in April 1991. A new goal was for respondent to maintain a residence, and she began to cooperate. Her progress under this plan was termed satisfactory. During that period, Newsome broke into respondent's apartment, battered her severely, and caused significant damage to her apartment. After about a month, respondent resumed her relationship with Newsome. She failed to cooperate with protective payee services for her SSI income. Respondent allowed Newsome to continue to reside with her, which was in violation of her lease. She was evicted soon after.

The service plan for October 1991 had the same goals as the previous plans. Cooperation with the home interventionist was unsatisfactory. She was to learn budgeting, independent living, home maintenance, and parenting skills. She did not keep several appointments, or she was not up or awake despite constant reminders. Respondent refused to cooperate with Crosspoint. She had not maintained a residence because Newsome had broken into her apartment and caused her to be evicted. She did complete the parenting classes.

For the April 1992 plan, the permanency goal was changed from a return home of the children to substitute care pending a court decision on termination of parental rights. The goals for respondent were basically unchanged. Her progress in cooperating with the home interventionist was unsatisfactory. She was not up or awake for many of the appointments; she continued to refuse payee services and was having budgeting problems. She failed to cooperate with Crosspoint, except to obtain a psychological evaluation. She did satisfactorily maintain a residence. She was also evaluated by the Department of Rehabilitation Services (DORS) and her IQ was found to be 57. Her word recognition was at a third-grade level. DORS recommended that she cooperate with a vocational training program.

In her October 1992 service plan, respondent did not cooperate with Crosspoint's community support service program. She showed

some cooperation with the home interventionist, and she cooperated with DORS on the training program. She made progress in learning to use public transportation, but she had a great deal of difficulty shopping because of her inability to read price tags or add her purchases. She was also to use birth control, but did not. Had the goal of the service plan been a return home, it would have been rated as unsatisfactory.

For her April 1993 service plan, respondent had been cooperating with her home interventionist. She had been dropped from the DORS plan for nonattendance. She had been maintaining a stable residence. DORS did another evaluation, which showed respondent was actually retarded and that she has severe weaknesses in the areas of domestics, health, safety, time, and money.

Kreckman testified she drove respondent to her appointment with Dr. Traver in September 1991 and that, on the way, respondent told her about seeing flames of fire in her children's eyes. She put her fingers before their eyes in the shape of a cross and became scared. She also described seeing an ape-like man at her father's house and about her deceased mother shaking her bedposts while she prayed.

Kreckman testified that Dr. Talbert, the psychiatrist who saw respondent after she had seen Dr. Traver, reported that she was not delusional, psychotic, or depressed, and that she would not benefit from medication or further counseling. Kreckman also admitted that during the course of her tenure as respondent's caseworker many of the goals were shown as partially met from time to time because respondent was working on them and trying. However, since she did not actually meet the goals, her performance was eventually rated unsatisfactory. She also testified that personnel at Crosspoint told her they did not want to work with respondent.

On the issue of supervision of the children, Kreckman testified respondent had told her that the children were smart enough to stay by themselves. During visits with the children, respondent did not show she could utilize the knowledge gained from attending the parenting classes.

Dorothy Pegeus, respondent's home interventionist for two years beginning in May 1991, testified that she supervised respondent's visits with the children and helped her with transportation, budgeting, and other matters. She met with respondent an average of three times per week. There was an incident in October 1991 in which respondent wandered away from her home with the children without permission and was gone for an hour. After that, visits were moved to the DCFS office. On one visit, H.N. hit respondent in the head with a toy and J.P. called her a dummy. Respondent had no re-

action and did not try to stop them. Another time, respondent was unable to control H.N. when she disrupted the visitation by throwing toys and crayons on the floor. H.N. often disrupted visits with temper tantrums. Respondent did not display any type of parenting techniques, but would merely tell H.N. to stop or that she was not going to visit H.N. anymore if she did not behave. Respondent would offer the children money if they would behave, which seemed more of a bribe to Pegeus than a reward for good behavior. At a visit in February 1993, respondent had been drinking; she stated she was depressed.

Pegeus testified that respondent had made efforts to acquire parenting skills, but had made only some progress. That progress was not noticeable until the end of 1992. She did not feel respondent could handle a visit alone with the children without her there.

Respondent testified on her own behalf. She denied she saw flames of fire in her children's eyes and stated she did not recall whether she told anyone she did. She gives her children money, not to bribe them but because she loves them. Respondent testified that her home interventionist did not really do anything for her except help her find an apartment not fit to live in. She had begun taking literacy classes in January 1993.

The children's guardian *ad litem* called Kreckman to the stand. She testified that after the shelter-care hearing in September 1990, the court allowed the children to stay with respondent, ordering her to cooperate with DCFS. One thing respondent was to do was see that J.P. went to school. He was enrolled in school in October 1990, but missed 13 of 15 days in December and 16 of 18 days in January. It was important that J.P. be in school, because he needed early childhood education services to get him ready for first grade. Respondent's excuses for the missed days were that J.P. was ill, she was ill, or it was too cold.

The court took judicial notice of the fact that James Pitts' parental rights to a child belonging to him had been terminated in the circuit court. After conclusion of the evidence, the court found respondent to be an unfit parent. A dispositional hearing was held on June 29, 1993. On July 9, 1993, the court entered a dispositional order terminating parental rights of respondent and of the two fathers, and appointing a guardian for J.P. and H.N. with power to consent to their adoption.

On appeal, respondent argues the State failed to prove her an unfit parent by clear and convincing evidence. She first argues the State was required to prove both that she had failed to make a reasonable effort to correct conditions that were the basis for removal of

the children and that she had failed to make reasonable progress toward return of the children to her within 12 months of the adjudication. Her argument is based upon the fact that the State's petition to terminate her parental rights pleaded both these grounds of unfitness in the same subparagraph and used the connective word "and" rather than pleading them in the alternative. She then argues that neither ground was established by the evidence.

■ Courts will not lightly terminate parental rights, recognizing the importance of those rights. (*In re A.T.* (1990), 197 Ill. App. 3d 821, 825, 555 N.E.2d 402, 405.) Parental rights of a nonconsenting parent may be terminated only upon a finding of unfitness (*In re S.G.* (1991), 216 Ill. App. 3d 668, 669, 575 N.E.2d 932, 933, *appeal denied* (1991), 142 Ill. 2d 654, 584 N.E.2d 140), and such a finding must be supported by clear and convincing evidence (*In re Allen* (1988), 172 Ill. App. 3d 950, 956, 527 N.E.2d 647, 651). The trial court's finding will not be reversed unless it is against the manifest weight of the evidence, since that court had the opportunity to see the witnesses and evaluate their credibility. (*Allen*, 172 Ill. App. 3d at 956, 527 N.E.2d at 651.) The court's finding should therefore be given great deference. (*In re C.R.* (1991), 221 Ill. App. 3d 373, 379, 581 N.E.2d 1202, 1206.) For a finding to be against the manifest weight of the evidence, the opposite result must be clearly evident from a review of the evidence. *Stone v. City of Arcola* (1989), 181 Ill. App. 3d 513, 530-31, 536 N.E.2d 1329, 1340.

■ We reject respondent's argument that the State was required to establish both of the aforementioned grounds of unfitness and note she cites no cases to support this argument. On the contrary, it has been held that only one ground of unfitness need be proved to find a parent unfit. (See *In re Edmonds* (1980), 85 Ill. App. 3d 229, 232-33, 406 N.E.2d 231, 234-35.) In addition, the language of the statute indicates the two standards are disjunctive, meaning that either ground may be established as a basis for unfitness. Ill. Rev. Stat. 1991, ch. 40, par. 1501(D)(m).

■ Whether a parent's efforts to correct conditions which were the basis for removal of the child are reasonable involves a subjective judgment based upon the amount of effort reasonable for the parent whose rights are sought to be terminated. (*In re S.J.* (1992), 233 Ill. App. 3d 88, 117, 598 N.E.2d 456, 475.) The major conditions causing the children to be removed from respondent's home were environmental neglect and inadequate supervision. There was conflicting evidence as to efforts made by respondent to correct these conditions. It appears that respondent made some efforts in the first year after removal of the children. Kreckman, respondent's caseworker, testified

that many of the objectives of her service plans were being partially met during that period. However, there were other areas where it appeared respondent did not make an effort. She refused to accept services of a protective payee, even though she had difficulty managing her money. Despite an obvious need for her to make an effort to improve her ability to read and write, she undertook efforts in that direction only shortly before the hearings on the State's petition to terminate. She was not to reside with Benny Newsome because of his physical abuse of her, but she continued to reside with him for some time after the children were removed. At the time of the hearing, she was residing with a man whose own parental rights had been terminated. Although respondent had been taught parenting skills in her classes, the home interventionist testified she did not apply those when the children visited her. She offered her children money in an effort to make them behave, although H.N. was not old enough to understand the concept of money. The home interventionist testified she interpreted the offers of money as a bribe to secure the children's good behavior. Although the evidence showed that respondent is mildly mentally retarded and this fact must be taken into consideration in any determination as to whether her efforts were reasonable, we note respondent testified at the hearing on her own behalf and seemed to have no difficulty understanding questions asked her. She also seemed to understand why the children had been taken from her and why she was being required to fulfill the goals set for her by DCFS. We hold the trial court's finding of unfitness as to this first standard is not against the manifest weight of the evidence.

■ An assessment as to whether respondent had made reasonable progress toward return of the children involves an objective judgment based upon the amount of progress made by the parent. At a minimum, some measurable or demonstrable progress toward the goal of reunification must be shown. Reasonable progress may be found when the court, based upon the evidence, can conclude a parent's progress is sufficiently demonstrable and is of such a quality that the child can be returned to the parent in the near future. (*In re L.L.S.* (1991), 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387.) In making this determination, the court should consider progress made during the entire post-adjudication period and not simply during the 12 months immediately following the adjudication. *A.T.*, 197 Ill. App. 3d at 832, 555 N.E.2d at 409.

Respondent argues that a parent with reduced intellectual ability might make limited progress toward return of the child, thereby implying that such limited progress would be sufficient to avoid a

termination. In *Edmonds,* the trial court had before it a mildly mentally retarded mother whose son was adjudicated neglected. Her parental rights were terminated by the court, on the basis that she failed to make reasonable efforts to correct conditions causing her son to be taken from her and failed to make reasonable progress toward his return to her. On appeal, one of her arguments was that the progress she had made was reasonable for a person of her limited mental ability. The court answered that contention with a quotation from *In re Austin* (1978), 61 Ill. App. 3d 344, 350, 378 N.E.2d 538, 542-43:

> " '[T]he term "reasonable progress" requires at a minimum measurable or demonstrable movement toward the goal of return of the child. Whether a small amount of progress is "reasonable" must be determined with proper regard for the best interests of the child. Such an inquiry might well involve consideration of the *** possibility that the child might be forced to indefinitely reside with a succession of impermanent foster parents.' " *Edmonds,* 85 Ill. App. 3d at 233, 406 N.E.2d at 235.

■ While it is true that the evidence showed respondent partially met some of the objectives of her service plans at various times during the post-adjudication period, the DCFS caseworker testified this merely meant respondent was trying. According to the caseworker, the final outcome of all respondent's service plans was unsatisfactory. We note respondent does not contend any of the goals of her service plans were beyond her ability to fulfill. Accordingly, we find no error in the trial court's conclusion that respondent had not made reasonable progress toward return of her children to her custody.

■ Respondent also argues that the State failed to prove her unfit under the provisions of section 1(D)(p) of the Act, which provides that unfitness may be established based upon:

> "[An] inability to discharge parental responsibilities supported by competent evidence from a psychiatrist or clinical psychologist of mental impairment, mental illness or mental retardation as defined in Section 1—116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1—106 of that Code, and there is sufficient justification to believe that such inability to discharge parental responsibilities shall extend beyond a reasonable time period." Ill. Rev. Stat. 1991, ch. 40, par. 1501(D)(p).

Developmental disability is defined in section 1—106 of the Code:

> "[A] disability which is attributable to: (a) mental retardation, cerebral palsy, epilepsy or autism; or to (b) any other condition which results in impairment similar to that caused by mental retardation and which requires services similar to those required

by mentally retarded persons. Such disability must originate before the age of 18 years, be expected to continue indefinitely, and constitute a substantial handicap." Ill. Rev. Stat. 1991, ch. 91$^{1}$/$_{2}$, par. 1—106.

Mental retardation is defined in section 1—116 of the Code as "significantly subaverage general intellectual functioning which exists concurrently with impairment in adaptive behavior and which originates before the age of 18 years." Ill. Rev. Stat. 1991, ch. 91$^{1}$/$_{2}$, par. 1—116.

Respondent complains of the lack of objective testing done by Dr. Traver before rendering her opinion that respondent was mentally retarded and suffered from a developmental disability. However, respondent fails to cite any cases which state that such objective testing is required. Dr. Traver interviewed respondent for one to two hours. She stated she relied on respondent's DCFS case history as well as her interview. Both Dr. Traver and respondent's DCFS caseworker testified that respondent reported hallucinations. One of those hallucinations was that respondent saw flames of fire in her children's eyes and she placed her fingers in front of their eyes in the form of a cross. While respondent had denied harming the children because of this hallucination, Dr. Traver was concerned about it. Dr. Traver's opinion that respondent was mentally retarded was confirmed by the testimony of the DCFS caseworker that respondent had been tested by DORS and her IQ was 57, within the mildly mentally retarded range. The opinion of Dr. Traver was that respondent's impairment and inability to parent would extend beyond a reasonable period of time. That opinion was based upon the fact that she began having symptoms in her childhood and that she had not progressed at the time Dr. Traver saw her, despite services offered to her.

Respondent seeks to point out differences between the conclusions of Dr. Traver and those of Dr. Talbert, the psychiatrist respondent saw. However, Dr. Traver testified that her conclusions were basically consistent with those of Dr. Talbert. Based upon testimony and Dr. Talbert's report, any differences would appear minor. We note that Dr. Talbert reported respondent did not seem to be delusional, psychotic, severely depressed, or anxious. However, Dr. Traver testified it was not clear from Dr. Talbert's report that he had been told of respondent's hallucinations as related to Dr. Traver and Kreckman. In addition, Dr. Traver noted that respondent was not psychotic or delusional during her own interview.

The fact that respondent has now learned to use public transportation and is taking classes to assist her in learning to read, write,

and perform simple arithmetic does not indicate she will, in the near future, be able to discharge her parental responsibilities. Evidence shows respondent has made little progress over the approximately $2^1/2$-year period between the adjudication and the termination hearing. Evidence before the trial court was sufficient to support its finding that respondent was unable to discharge her parental responsibilities and that this inability was likely to extend beyond a reasonable period.

For the reasons stated, the trial court's order terminating respondent's parental rights is affirmed.

Affirmed.

COOK and STEIGMANN, JJ., concur.