615 N.E.2d 827 (1993)
246 Ill. App.3d 143
186 Ill.Dec. 23
In the Interest of J.J., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
Brenda L. Johnson, Respondent-Appellant).
No. 4-92-0773.
Appellate Court of Illinois, Fourth District.
June 17, 1993.
Kelly James Lonergan, J. Steven Beckett, Beckett & Associates, P.C., Urbana, for respondent-appellant.
*828 Thomas J. Difanis, State's Atty., Urbana, Norbert J. Goetten, Director, State's Attys. Appellate Prosecutor, Springfield, Robert J. Biderman, Deputy Director, James Majors, Staff Atty., for petitioner-appellee.
Justice KNECHT delivered the opinion of the court:
Brenda Johnson appeals from the order of the circuit court of Champaign County, adjudicating her daughter, J.J., a dependent minor. (Ill.Rev.Stat.1991, ch. 37, par. 802-4(1)(b).) Johnson argues J.J. could not be a dependent minor within the definition of the statute, because J.J. was never in the care of Johnson. Johnson also argues the trial court's determination J.J. is a dependent minor is against the manifest weight of the evidence. We disagree and affirm.

FACTS
Johnson was 32 years old at the time of the adjudicatory hearing. Johnson graduated from high school with a special education diploma. She has a full-scale IQ of 77, which places her on the upper end of borderline intelligence. When Johnson was 21 or 22 years old, she moved out of her mother's home. Johnson lived with her sister, Sharon Cinnamon, for three years. During this time, when Cinnamon's daughter Laura was between the ages of one and four years old, Johnson cared for Laura 40 hours per week while Cinnamon worked. For approximately the last eight years, Johnson had lived independently and had been employed in various jobs, her length of employment at each job ranging from a few days to four years.
Johnson gave birth to J.J. on March 28, 1992, at Covenant Medical Center (Covenant). J.J. was taken from the hospital into protective custody by the Department of Children and Family Services (DCFS) on March 30, 1992. The primary reason DCFS was contacted was because Johnson had made a comment that she should kill the baby. There was some inconsistency in the testimony regarding whether this comment was made during Johnson's labor, or pre-term labor; however, the majority of the testimony indicates this comment was made during Johnson's pre-term labor. The hospital staff was also concerned about Johnson's ability to care for J.J. DCFS was awarded temporary custody of J.J. at a shelter-care hearing on April 1, 1992. An adjudicatory hearing was held in two parts, June 1, 1992, and July 10, 1992. The trial court made a finding J.J. was a dependent minor. At a dispositional hearing on August 25, 1992, the court adjudicated J.J. to be a dependent minor and awarded custody and guardianship to DCFS.

The Adjudicatory Hearing
At the adjudicatory hearing, the State presented the testimony of several nurses from Covenant, two DCFS workers, and a Catholic Community Services worker.
Diane Ortel, a nurse at Covenant, testified she admitted Johnson to the hospital when Johnson was approximately 30 weeks pregnant, as a pre-term patient. While an IV and possibly a catheter were being inserted, Ortel heard Johnson state she should just kill her baby or have a pre-term baby and get it over with.
Dorothy Gray testified she was employed as a nurse at Covenant. Gray testified she was in charge of the care and education of Johnson after the birth of J.J. Gray testified she had to repeat and remind Johnson of instructions.
Cheryl Buckner, a nurse employed at Convenant, testified she helped to educate Johnson in the care of J.J. Buckner testified on one occasion she observed Johnson leaning over to put the telephone down while holding J.J. J.J. "kind of slumped over," and Buckner heard Johnson say "Oh, I hope I don't break her neck." Buckner also testified that when told J.J. would need to be fed every four hours, Johnson asked if it were really necessary to feed J.J. that often. Buckner testified she had concerns regarding Johnson's abilities to care for J.J.
Penny Graham, a Child Welfare Specialist II for DCFS, testified Johnson explained she made the statement about killing J.J. because she was upset for a variety of reasons, including the difficulty of her *829 pregnancy and labor. Graham testified Johnson admitted to her that she (Johnson) recognized she needed more information or more classes to be able to take care of J.J. Graham testified she asked Johnson a series of hypothetical questions regarding how Johnson would care for J.J. in a variety of situations. Johnson had to think for awhile before answering the questions, but she was always able to give appropriate responses to the questions.
Summers, a DCFS worker, testified that when she told Johnson DCFS was going to take J.J. into protective custody, Johnson became upset and grabbed a telephone in a very quick motion. Summers testified she felt Johnson was going to throw the telephone at her. Two security guards stepped forward. Johnson asked why the guards stepped forward and Summers told Johnson it was because they feared Johnson was going to throw the telephone. Johnson replied she was not going to throw the telephone and stated she would "be nice."
Nancy Abbott, a foster-care caseworker at Catholic Social Services, testified she worked in conjunction with DCFS. Abbott provided services to Johnson and monitored her visitation sessions with J.J. Abbott testified Johnson was unsure how to care for J.J. and needed prompting regarding what she needed to do. Abbott testified Johnson is careful about watching out for J.J.'s head and asks questions about how to take care of J.J. Abbott testified it is sometimes necessary to repeat or remind Johnson of instructions. After Johnson was instructed two or three times, she was able to take care of J.J. Abbott testified Johnson handles learning tasks easily. Abbott testified one incident caused her concern. One night at midnight, Johnson experienced pain. Rather than calling 911, a friend or relative, to request a ride to the hospital, Johnson began to walk the five or six blocks from her apartment to the hospital. Two police officers, in a police car, spotted Johnson en route, and drove her the remainder of the way to the hospital. Abbott believed walking to a hospital a few blocks away was a sign of poor judgment. Abbott testified she had been told Johnson has an IQ of 77, and has expressive aphasia, and as a result, needs to be spoken to and learns skills very slowly. On crossexamination, Abbott indicated Johnson exhibited loving behavior toward J.J., and had been concerned and indicated her desire to have J.J. come home.
The respondent presented the testimony of Johnson's physician, mother, and sister. Dr. Lawrence Gratkins testified Johnson became his patient after she discovered she was pregnant. Gratkins testified Johnson's pregnancy was complicated by an episode of pre-term labor, making her pregnancy a high-risk pregnancy. As a result, beginning in the 28th week of her pregnancy, Johnson was required to have antenatal testing performed twice per week, ultrasound examinations, and take medication on a regular basis. The antenatal testing required that Johnson follow instructions regarding whether to have a full or empty bladder at the time of the medical appointment, depending on the time of pregnancy. Gratkins testified he gave Johnson numerous instructions, which Johnson followed. Johnson attended her appointments regularly, and had good bonding with her baby during the pregnancy. Gratkins testified Johnson could see the baby on the video screen during sonographies, and asked questions regarding the parts of the baby. Gratkins visited Johnson in the hospital. Gratkins found Johnson's behavior to be appropriate, and felt she would comply with instructions; accordingly, he authorized the hospital to release J.J. to her. In response to a question asked by the court, Gratkins testified he did not have concerns regarding Johnson having the sole responsibility for the care of J.J. Gratkins stated his concern was only regarding Johnson's financial situation. Gratkins testified he has had many patients who were in worse intellectual straights than Johnson who have gone home with children and done quite well with them by using the available social agencies.
Carol Slack, Johnson's mother, testified Johnson, in her youth, baby-sat for children. Johnson also took care of Laura, the daughter of Sharon Cinnamon, Johnson's *830 sister. Slack testified Johnson took good care of Laura, fed her properly, kept her clean, and disciplined her appropriately. Slack testified if Johnson were granted custody of J.J., Slack would be available to assist in the care of J.J. on evenings and weekends. Slack explained the circumstances under which Johnson made the statement about killing the baby. Johnson had been admitted to the hospital and was told by the nurse the baby needed to be monitored. Johnson asked why, and the nurse said "so you don't have a pre-term [sic] baby." Johnson had a friend who had a pre-term baby, and it was born with birth defects. Johnson became hysterical thinking she was going to have a pre-term baby. It was under these circumstances she said she should kill the baby.
Cinnamon also testified regarding Johnson's care of Laura. Johnson cared for Laura from the time Laura was one year old until she was three or four. During this time Johnson lived in the Cinnamon residence and cared for Laura 40 hours per week while Cinnamon worked. Cinnamon testified Johnson was able to follow through with child-care instructions and took good care of Laura. Johnson cared for Laura when Laura had a cold; however, she was not faced with any medical emergencies while responsible for Laura. Cinnamon testified she would be willing to assist in the care of J.J. on weekdays after 1:30 p.m. and on weekends.
At the close of this hearing, the court found the State had failed to prove either that J.J. was a neglected or an abused minor. However, finding the court had an unusual duty in juvenile cases, the court sua sponte raised the issue of whether J.J. was a dependent minor, ordered the pleadings be amended to allege J.J. was a dependent minor, and made a finding J.J. was, in fact, a dependent minor. The court specifically stated it was not making an adjudication but, rather, merely a finding of dependency. Explaining its finding, the court stated:
"[If] we are to evaluate the ability of the Respondent Mother, as we sit here today, to act as a full custodial parent to the child, I think everyone would agree that she probably can't do that; however, that's not to say that she cannot do that with the proper level of support. The trick is to find that level of support."
Between the shelter-care hearing and adjudicatory hearing, Johnson had visits with J.J. two or three times per week, for 2½ hours each visit, supervised by caseworkers from Catholic Community Services. At the adjudicatory hearing, the court authorized DCFS to implement extended, including overnight, visitation and delegate the authority for supervision to a responsible family member or other responsible adult.

The Dispositional Hearing
At the dispositional hearing, the State submitted a report prepared by Abbott, and including a psychologist's report. Abbott's report indicated, after the adjudicatory hearing, visitation was scheduled from 2 to 7 p.m. on Wednesdays, and from 2 p.m. on Fridays to 7 a.m. on Mondays. This visitation schedule was interrupted due to a quarrel between Johnson and her mother and sister, who supervised the visits. When this arrangement terminated, Johnson requested that a member of Catholic Community Services supervise her visits with J.J.
Abbott stated Johnson is able to follow through with instructions regarding the care of J.J., provides adequate care for J.J., and requires little instruction on routine care and feeding. However, as J.J. grows and enters new phases of development, Johnson will require additional instruction. Johnson looks forward to visits with J.J. and is eager to demonstrate that she can physically care for her. Johnson states she recognizes potential hazards that J.J. could be exposed to and represents she will remove her from such situations. Johnson is disappointed when J.J. does not smile at her or show recognition Johnson is her mother. Abbott reported Johnson believes she can care for J.J. without help and was not interested in taking parenting classes or obtaining counseling.
Dr. Marty Traver, a clinical psychologist, examined Johnson, and his report was submitted to the court. Johnson told Traver *831 she was a special education student because she needed glasses and did not study. Traver stated Johnson is unaware of her intellectual limitations and does not understand the concerns of others regarding her ability to care for a child. Johnson believes other people are responsible for her anger because they make her argue by saying negative things about her and do not listen to her.
Traver stated the results of his tests and evaluation of Johnson indicate she does not process information from social situations and does not retain information as well as her general IQ might indicate. She has difficulty understanding and interpreting social situations. Traver additionally stated, in his report, "[p]ractical judgment, common sense, and reality testing would be reflected in these low scores. Memory and attention appear impaired. Planning related to social intelligence appears weak." Traver indicated Johnson has not demonstrated good judgment in her personal and sexual life. Johnson reported doing things she did not want to do, and protecting the identities of men because they requested her to do so. Traver noted Johnson's plans for her life included finding a man and having him take care of her. Johnson reported it was very difficult to baby-sit for J.J. all weekend with her mother supervising her. Traver took Johnson's comment regarding killing the baby seriously, and recommended extreme caution should be used in allowing Johnson to attempt child care on her own.
When asked if there were any corrections which Johnson wished to make in the reports, Johnson's counsel stated Johnson was willing to take parenting classes. The attorney stated Johnson was under the mistaken belief she had to have J.J. with her in order to take parenting classes, and it was based on this mistaken belief that she stated she was not going to go to parenting classes.
At the close of this hearing, the court adjudicated J.J. a dependent minor. In making this determination, the court stated:
"I do not question now nor have I ever questioned the love and dedication that the Respondent Mother has for her child nor do I question or challenge her willingness to undertake the burden of parenting. However, I do believe its a question of needing appropriate instruction and then support before she is able to exercise that care.
It's apparent from the report and from the conclusions of everyone that while certainly Ms. Johnson is capable of learning how to care for her child, it takes a great deal of repetition and then someone there to reinforce it and then it has to be updated as the child develops, and, of course, the child is developing very quickly at this age, and for that reason, I don't believe she is in a position today to exercise custody.
I'm very glad she does want to cooperate with parenting classes, and I hope she will certainly cooperate with counseling because I would have to honestly say that I would probably never return custody of [J.J.] to her unless and until she is able to complete a course of parenting instruction correctly and to successfully complete a course of counseling as well."

ANALYSIS
Section 2-4(1)(b) of the Juvenile Court Act of 1987 provides a dependent minor is one "who is without proper care because of the physical or mental disability of his parent, guardian or custodian." (Ill. Rev.Stat.1991, ch. 37, par. 802-4(1)(b).) Johnson's first argument is that J.J. cannot be a minor without the care of her parent, under section 2-4(1)(b), because J.J. was never in the care of her parent. Under Johnson's construction of section 2-4(1)(b), the court may not determine whether a minor is dependent within the scope of section 2-4(1)(b) unless the child has been in the care of the parent, and while in such care, did not receive proper care due to the parent's disability. In other words, the parent must be given the opportunity to demonstrate that her disability will not impair her ability to provide proper care for the child. In support of her position, Johnson directs our attention to the fifth district's *832 decision in In re Gates (1978), 57 Ill.App.3d 844, 15 Ill.Dec. 222, 373 N.E.2d 568.
In Gates, the minor was born with only one lung and an incomplete esophagus. Susie Gates, the mother, did not believe she could care for the minor and signed a release authorizing DCFS to place the minor in a foster home. The minor remained hospitalized for approximately two months after her birth, and then was placed in a foster home. (Gates, 57 Ill.App.3d at 846, 15 Ill.Dec. at 225, 373 N.E.2d at 571.) Four days later, a petition was filed alleging the minor was neglected in that her mother failed to cooperate with the hospital staff's attempts to train her to care for the child's special needs; this petition was amended to allege the child was a minor in need of supervision. About a week before the child's first birthday, the State filed a petition alleging the minor to be neglected because Gates had failed to express a proper interest in the minor and refused to be trained regarding how to meet the minor's special needs. (Gates, 57 Ill.App.3d at 847, 15 Ill.Dec. at 225, 373 N.E.2d at 571.) Reversing the trial court's finding the minor was neglected because of her mother's lack of attention and care, the appellate court stated a determination of whether a child is neglected involves a determination of whether the minor is receiving the care necessary for his well-being, not a determination of whether the parent has been neglectful. Gates, 57 Ill.App.3d at 849, 15 Ill.Dec. at 227, 373 N.E.2d at 573.
Thus, under Gates, a determination of whether a minor is neglected involves a focus on the child, namely an examination of whether the child's needs have been met. Where the minor has been in the custody of DCFS since being released from the hospital after birth, the child may not be a neglected child unless he suffered such neglect at the hands of the hospital or DCFS, or the parent interfered in some way with the child's care while hospitalized or in DCFS custody. Conversely, determination of whether a minor is a dependent child focuses on the parent rather than the child. Specifically the focus is on whether the disability of the parent is such that it impairs the abilities necessary for the care and parenting of the minor. Although the best evidence of whether a parent's disabilities interfere with her ability to care for the minor is clearly an observation of how, when given the chance, that parent cares for that minor, it is not the only evidence of whether a disability will interfere with parenting abilities. Rather, the scope and extent of the disability may be determined from other evidence, including observations of the parent with the child during hospitalization after the birth of the child, observations of the parent in other contexts, and medical or other evidence regarding the parent's limitation due to the disability.
Consequently, we hold where evidence demonstrates the parent's disability is one which significantly impairs abilities necessary to the care and parenting of a child, the minor may be found and adjudicated to be a minor without proper care due to the physical or mental disability of the parent (Ill.Rev.Stat.1991, ch. 37, par. 802-4(1)(b)), even if the parent has not had the opportunity to exercise sole physical custody over the minor. A contrary holding would require, e.g., that a minor born to a comatose mother be placed in the care and custody of the mother in a futile inquiry into whether the mother's disability prevented her from providing proper care to the child.
Johnson next contends the trial court's adjudication of J.J. as a dependent minor was manifestly erroneous. Dependency need only be established by a preponderance of the evidence. (In re Jackson (1980), 81 Ill.App.3d 136, 138, 36 Ill.Dec. 507, 508, 400 N.E.2d 1087, 1088.) A trial court's determination regarding dependency will not be overturned unless it is manifestly erroneous. (Cf. In re Stilley (1977), 66 Ill.2d 515, 517, 6 Ill.Dec. 873, 874, 363 N.E.2d 820, 821 (neglect determination).) A trial court's judgment is not manifestly erroneous merely because the reviewing court might have ruled otherwise. Rather, a judgment is against the manifest weight of the evidence if it is clearly evident a conclusion opposite to that reached by the trial court was the proper disposition. Stone v. City of Arcola (1989), 181 Ill. App.3d 513, 528, 130 Ill.Dec. 118, 127, 536 N.E.2d 1329, 1338.
*833 In the present case, the trial court was presented with this evidence: Johnson did not recognize her limitations; she had argued with her mother and sister and, as a result, they were unavailable to assist her in the care of J.J.; she found caring for J.J. under her mother's supervision difficult; and while she currently provided adequate care for J.J. during the visitation sessions, she might have difficulty caring for J.J. 24 hours per day, and also might have difficulty dealing appropriately with new or unforeseen situations. Although the opinion of her physician that she could follow directions and care for J.J., Abbott's statement that she provided J.J. with adequate care, her previous history of caring for her niece, her history of independent living, and her explanation, at the dispositional hearing, that she was willing to take parenting classes, might have enticed us to rule differently, we do not find the trial court's determination J.J. was a dependent minor and that Johnson should attend parenting classes and counseling sessions prior to exercising custody of J.J. was against the manifest weight of the evidence. Accordingly, we affirm the decision of the circuit court of Champaign County.
Affirmed.
STEIGMANN, P.J., and GREEN, J., concur.