In re C.S., Jr., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Cleo Morrel Singleton et al., Respondents-Appellants).

Fourth District    No. 4—97—0331

Opinion filed February 19, 1998.

Maureen A. Dickinson, of Law Offices of Maureen Mahoney Dickinson, of Galesburg, for appellants.

Paul L. Mangieri, State's Attorney, of Galesburg (Norbert J. Goetten,

Robert J. Biderman, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In June 1995, the trial court entered an order adjudging C.S., Jr. (C.S.) (born September 14, 1994), the minor child of respondent mother, Stacy Lynn Singleton, n/k/a Stacy Lynn Heine, and respondent father, Cleo Morrel Singleton, a neglected minor. After a September 1995 dispositional hearing, the court formally adjudicated C.S. a ward of the court and appointed the Department of Children and Family Services (DCFS) as his guardian with the power to place him.

In November 1996, the State filed a petition to terminate the respondents' parental rights regarding C.S. During January and March 1997, the trial court conducted hearings and found respondents to be unfit parents. In April 1997, the court conducted a dispositional hearing and granted the State's petition to terminate their parental rights.

Respondents appeal, arguing that (1) the trial court's June 1995 order adjudicating C.S. a neglected minor and its September 1995 dispositional order are void; and (2) the court's finding of parental unfitness was against the manifest weight of the evidence. We dismiss respondent parents' appeal of the court's June 1995 and September 1995 orders and otherwise affirm.

## I. BACKGROUND

In June 1994, the State filed a petition for adjudication of wardship, alleging that respondents had neglected C.S. because (1) they did not provide the proper or necessary support or other care necessary for his well-being, including adequate food, clothing, and shelter; and (2) they created an environment injurious to his welfare. After hearings conducted from March 1995 through June 1995, the trial court entered an order adjudicating C.S. a neglected minor, pursuant to section 2—3(1) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2—3(1) (West 1994)). In September 1995, the court held a dispositional hearing and adjudged C.S. a ward of the court, placing him in the custody and guardianship of DCFS.

At the dispositional hearing, the trial court ordered respondents to cooperate with DCFS, participate in ongoing parenting education, and participate in counseling (including psychiatric evaluations and treatment). The court also ordered respondent father to complete a psychological evaluation and participate in any recommended treatment regarding a prior criminal sexual abuse conviction. Respondent parents' October 1995 DCFS service plan also required that they (1)

cooperate with all scheduled home visits; (2) maintain a two- to three-day supply of food in their home at all times; (3) demonstrate learned parenting skills during visits with C.S.; (4) secure additional parenting information through a visitation specialist; (5) maintain their home by cleaning up animal feces and urine, taking out garbage as needed, cleaning out the litter box twice weekly, and cleaning floors daily; (6) remove untrained animals from their home; (7) establish and follow a monthly budget; and (8) maintain working utilities in their home. The service plan required respondent mother to participate in any recommended counseling and treatment to address her inability to control her anger and frustration, marital conflicts, placement of her other children, parenting skills, and self-esteem. The service plan also required respondent father to participate in any recommended treatment to address marital issues, dependency issues, parenting skills, stress, and risk of sexual abuse.

In November 1996, the State filed a petition under sections 1(D)(m) and 1(D)(p) of the Adoption Act to terminate respondents' parental rights, alleging that respondents were unfit because (1) they failed to "make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child" since the June 1995 adjudication of neglect; and (2) they were unable to discharge their parental responsibilities due to mental impairment, mental illness, or mental retardation (750 ILCS 50/1(D)(m), (D)(p) (West Supp. 1995)).

At the hearings on the State's petition to terminate parental rights, the evidence showed the following. Theodore Mathews, a clinical psychologist, testified that he conducted psychological evaluations of both respondent parents and found that respondent mother's intelligence was in the low-normal range but not so low as to interfere with her ability to parent C.S. Her problems as a parent were more likely to be motivational than the product of her limited intelligence. She would be unlikely to spend the energy and time necessary to care for her child over any protracted period of time.

Mathews also testified that respondent father was markedly impaired in his ability to (1) maintain attention and concentration on a child's needs for more than a short period of time, (2) work with others to provide guidance to a child without distraction from his own emotional problems, (3) respond appropriately to necessary changes in family routine, and (4) tolerate the normal stress of dealing with children in a family setting. Mathews further stated that he addressed the issue of respondent father's history of sexual abuse (with a child other than C.S.) and concluded that respondent father

exhibited "little willingness *** to recognize any responsibility for the sexual abuse."

Dr. Walid Maalouli, a pediatrician, testified that C.S. was born prematurely and exhibited significant developmental delays. At the time of the hearing, C.S. continued to exhibit developmental delays and required special treatment, including physical therapy and nutritional supplements.

Laurie Jean Mackay, a family support worker at Bridgeway Family Services, testified that she worked with respondents during June 1995 through November 1996 on issues such as parenting, budgeting, adequate housing, safety, and transportation. From June 1995 until August 1995, respondent parents lived in an apartment that was roomy and neat, but "had a horrible smell." Mackay stated that on her weekly visits, she frequently noticed animal feces on the floor. Another family support worker testified about her efforts to teach respondent parents basic parenting skills and her difficulties in doing so because they usually arrived late to these sessions and respondent mother had difficulty maintaining focus.

In August 1995, respondent parents were evicted and moved to an efficiency apartment (where they lived at the time of the hearings on the petition to terminate). That apartment was infested with hundreds of roaches. The apartment did not have a kitchen sink, and at one point, respondents had a cat which used as a litter box the same bathtub used to wash dishes. Respondents also allowed dog feces to remain on the kitchen floor for over a day at a time. During the period of time when C.S. was visiting there, Mackay saw cockroaches (some of which respondents had squashed and not cleaned up) and animal feces on the floor. During the entire time Mackay worked with respondents (June 1995 until November 1996), respondents kept a variety of animals, many of which were not house-trained.

Mackay further stated that respondent mother refused to work with Mackay to establish a budget because respondent mother had a representative payee who received her Supplemental Security Income check and issued checks to her as she requested them. On several occasions, respondent mother was argumentative and physically confrontational toward Mackay (swinging her arms at Mackay numerous times and throwing an object on one occasion).

Jennifer Foster, the social worker who supervised respondents' visits with C.S. following the June 1995 adjudication order, testified that they missed about one visitation per month when visits took place at DCFS. During visits, respondents often spoke to each other and Foster about topics unconnected to C.S., and they would ignore

what C.S. was doing. Respondents also had problems feeding and diapering their child.

Around March 1996, the visits were moved to respondents' apartment. Respondents usually were available for those visits, although they sometimes would have just awakened upon Foster's arrival with C.S. Respondent mother frequently sat on the floor with C.S. without interacting with him. During home visits, Foster noticed roaches, animal feces, and urine on the floor. Further, respondent parents were unable to adequately perform the physical therapy that C.S. required twice daily.

Through November 1996, no unsupervised visits were allowed because the home conditions were not safe enough and respondent parents were unable to maintain a visit for two hours without supervision. Foster opined that the home environment was dangerous for C.S. and respondent parents would never be able to provide the necessary care to C.S.

Jacqueline Bryant, the DCFS child welfare specialist, testified that she developed a client service plan for respondent parents following the June 1995 adjudication order. The service plan included the goals of maintaining a clean home, proper budgeting, dealing with respondent father's sexual abuse history, and dealing with respondent mother's anger problems. In October 1995, Bryant evaluated respondents' progress as unsatisfactory on all goals. In particular, respondent father denied past sexual abuse (despite the fact that he had been convicted), and respondent mother refused to seek counseling for her anger control problems.

At the conclusion of the March 1997 hearing, the trial court found respondents to be unfit pursuant to section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West Supp. 1995)). In April 1997, the court found it was in the child's best interest to terminate respondents' parental rights.

## II. ANALYSIS

### A. The Trial Court's Adjudicatory and Dispositional Orders

Respondents first argue that the trial court's June 1995 order adjudicating C.S. a neglected minor and its September 1995 dispositional order are void. Specifically, they contend that because the adjudicatory and dispositional hearings were not held within the statutorily prescribed time limits, the trial court lacked subject-matter jurisdiction to enter the orders it did, thus rendering them void and subject to attack at any time. We disagree.

### 1. Subject-matter Jurisdiction

■ Respondents correctly point out that (1) section 2—14 of the

Act requires that adjudicatory hearings be completed within 90 days of service of process upon the parties; and (2) section 2—21 of the Act requires that dispositional hearings be held within 30 days of the adjudication of neglect or abuse (705 ILCS 405/2—14, 2—21 (West 1994); *In re S.G.*, 175 Ill. 2d 471, 481, 677 N.E.2d 920, 925 (1997)). The adjudicatory hearing in this case was not completed until June 27, 1995, well beyond the 90-day statutory deadline. Further, the dispositional hearing was not held within the 30-day statutory limit. Nonetheless, the trial court's failure to comply with these statutory deadlines did not deprive it of subject-matter jurisdiction.

■ Except in the limited area of administrative review, circuit court jurisdiction is exclusively constitutional in origin. Although the legislature has no power to limit a court's constitutional jurisdiction to hear a matter, it may, by way of statutory enactment, create a "justiciable matter." *In re M.M.*, 156 Ill. 2d 53, 65, 619 N.E.2d 702, 709-10 (1993). Once a justiciable matter is created, circuit courts obtain subject-matter jurisdiction over such matters by way of the constitution. *M.M.*, 156 Ill. 2d at 65, 619 N.E.2d at 710. In cases where "a court's power to act is controlled by statute, *** courts exercising jurisdiction over such matters must proceed within the strictures of the statute." *M.M.*, 156 Ill. 2d at 66, 619 N.E.2d at 710 (juvenile court proceedings constitute special statutory proceedings). In *M.M.*, the supreme court held that "[w]ithout question, the juvenile court *** had subject matter jurisdiction," but the court "exceeded its statutory authority" by conditioning the guardian's power to consent to an adoption. *M.M.*, 156 Ill. 2d at 64, 66, 619 N.E.2d at 709, 710. See also *In re P.F.*, 265 Ill. App. 3d 1092, 1105-06, 638 N.E.2d 716, 725-26 (1994) (circuit court lacked statutory authority to order DCFS to cease efforts at family reunification). Thus, where a court in such a case fails to proceed "within the strictures of the statute," the court does *not* somehow lose its constitutionally conferred subject-matter jurisdiction; instead, it simply proceeds in error because it lacked "statutory authority."

■ Any error the trial court committed here in not holding the adjudicatory and dispositional hearings prior to the statutory deadlines did not render those orders void for lack of subject-matter jurisdiction. Thus, contrary to respondents' contention, those orders are not subject to attack at any time.

## 2. *The Late-filed Notice of Appeal*

■ Although the trial court entered its written order adjudicating C.S. a neglected minor on June 29, 1995, and its written dispositional order on September 14, 1995, respondent parents did not file a notice

of appeal until April 24, 1997. See *In re Smith*, 80 Ill. App. 3d 380, 381, 399 N.E.2d 701, 702 (1980) (in general, it is the dispositional order from which an appeal lies). Respondents' delay in filing a notice of appeal goes *far* beyond the 30-day limit set by Supreme Court Rules 303 and 660(b) (155 Ill. 2d R. 303; 134 Ill. 2d R. 660(b)), as well as beyond the period set for filing a late notice of appeal under Supreme Court Rule 303(d) (155 Ill. 2d R. 303(d)). In *In re S.J.*, 289 Ill. App. 3d 430, 431, 682 N.E.2d 444, 445 (1997) (Jenkins, appellant), quoting *Martin v. Cajda*, 238 Ill. App. 3d 721, 728, 606 N.E.2d 566, 571 (1992), this court addressed the issue of a late-filed notice of appeal in a juvenile court case and wrote as follows:

> " '[Completely dispositive of the issue before this court is the requirement that] "[t]o vest the appellate court with jurisdiction[,] a party must file a notice of appeal within 30 days after entry of [the] judgment appealed from." [Citation.] Compliance with the deadlines for appeals in Supreme Court Rule 303 is mandatory and jurisdictional [citations], and appellate jurisdiction may not be conferred by *laches*, consent, waiver[,] or estoppel.' "

On the record before us, we agree with the State that this court lacks appellate jurisdiction over respondent parents' appeal of the trial court's June 1995 adjudicatory order and its September 1995 dispositional order. Accordingly, we dismiss that portion of respondents' appeal.

### B. Standard by Which Reasonable Progress Is To Be Measured

Prior to reaching respondents' argument regarding the trial court's finding of unfitness, we address respondents' request that this court reconsider its decision in *In re L.L.S.*, 218 Ill. App. 3d 444, 577 N.E.2d 1375 (1991), in light of *In re S.J.*, 233 Ill. App. 3d 88, 598 N.E.2d 456 (1992) (T.J., appellant). For the following reasons, we decline to do so and reaffirm *L.L.S.*

In *L.L.S.*, this court addressed an argument by the respondent parents that reasonable progress must necessarily be tied to correcting the conditions that caused the initial removal of the minor child. In rejecting that argument, we wrote the following:

> "[W]e do not believe it impossible to measure progress without referring to a 'prior status, current status[,] and the process by which movement from the one status to the other occurred.' *** [I]n all cases in which a child is removed from a parent's custody after a dispositional hearing [citation], a court order to that effect has been entered. The reasons underlying that order should be one of the factors considered when the court (or an agency having authority to do so, like DCFS in the present case) decides what steps must be taken by the parent to achieve the return of the

child to the parent's custody. These steps should be designed to remediate parental deficiencies that, if not remediated, will prevent the child from being returned to the parent's custody. Once these steps have been set forth and provided to the parent, either by the court, an authorized agency, or both, then the focus of subsequent inquiry ought to be on the parent's progress or success in complying with the court's directives, the service plan, or both.

If, as here, the State subsequently challenges the parent's fitness under section 1(D)(m) of the Act on the ground that the parent has failed to make reasonable progress toward the return of the child within 12 months after the child was adjudicated neglected, abused, or dependent, the standard by which progress is to be measured is parental compliance with the court's directives, the service plan, or both. The precise circumstances of the parent at the time the court ordered the child removed from the child's parent and before the service plan was in place are *not* 'indispensable' [citation]." (Emphasis in original.) *L.L.S.*, 218 Ill. App. 3d at 463-64, 577 N.E.2d at 1388-89.

In *S.J.* (T.J., appellant) (233 Ill. App. 3d at 121, 598 N.E.2d at 477), the Second District Appellate Court declined to follow *L.L.S.* and held that "the ultimate issue is the reasonableness of the progress that the parent has made, in light of all the circumstances, in moving beyond the parental deficiencies that led to the initial removal of the child." The court in *S.J.* (T.J., appellant) reasoned that (1) to hold the respondent mother's failure to comply with the specifics of the authorized agencies' service plans would "unfairly and irrationally elevate administrative means over statutory ends"; and (2) to place "undue emphasis on compliance with service plans would raise the danger of a form of 'bootstrapping' under which a parent could lose her rights to her children because she failed to do things that were not necessarily related to her previously established shortcomings as a parent." *S.J.* (T.J., appellant), 233 Ill. App. 3d at 120, 598 N.E.2d at 477.

The second district in *S.J.* (T.J., appellant), noting that the condition under which S.J. was removed from the respondent mother's custody was the minor child's birth with cocaine in her system, characterized S.J.'s birth as a cocaine-addicted baby as a "unique event" that the respondent mother could have done nothing to correct after her child's adjudication of neglect. *S.J.* (T.J., appellant), 233 Ill. App. 3d at 117-18, 598 N.E.2d at 475. The second district thus gave little weight to the respondent mother's failure to comply with much of what the authorized agencies requested of her, including inpatient drug treatment and enrollment in parenting classes. *S.J.* (T.J., appel-

lant), 233 Ill. App. 3d at 120, 598 N.E.2d at 476. Instead, because the respondent mother tested negative for cocaine after the adjudication of neglect without having completed drug treatment (although she admittedly still used marijuana to help her relax when her children strained her nerves), the second district reversed the trial court's finding that she had failed to make reasonable progress. *S.J.* (T.J., appellant), 233 Ill. App. 3d at 121-22, 598 N.E.2d at 478.

We disagree with the above portions of *S.J.* (T.J., appellant). We believe it makes no sense to so narrowly limit what the trial court can order a respondent parent to do following an adjudication of neglect, abuse, or dependency. How could it possibly be that the legislature would tell the trial court that simply because the respondent parent has corrected *one* problem, the court can—indeed, should—ignore other parental deficiencies, even if such deficiencies could well threaten a child's well-being, safety, or life? In our judgment, both the reasoning and result in *S.J.* (T.J., appellant) run contrary to the purpose and procedural scheme of the Act.

*S.J.* (T.J., appellant) assumes that trial courts in juvenile proceedings address the issue of custody only at one point—namely, the dispositional hearing. This is incorrect. Courts in juvenile proceedings frequently need to address the question of a minor's temporary custody in a shelter care hearing at the very inception of the case. And even when a court has temporarily removed a child from its parent's custody, the court must still address the issue of custody again at the later dispositional hearing, assuming the case reaches that point. See 705 ILCS 405/2—23(1)(a) (West 1996). Typically, the reports and other evidence presented at the dispositional hearing will provide the court with far more information concerning that parent, child, and family situation than the court possessed at the time of the shelter care hearing.

The *S.J.* (T.J., appellant) analysis also ignores the procedure through which cases involving neglect, abuse, or dependency come before the juvenile court. The initial circumstance presented to the trial court—which leads to its decision to remove custody from the parent—frequently turns out to be merely one of several serious problems. However, the other problems often do not appear until further study and observation of the child, parent, and family situation bring them to light. Thus, what may appear to be a momentary lapse in parental judgment can turn out to be a symptom of more profound emotional, psychological, or even psychiatric problems which impair the performance of parental duties. Further, substance abuse all too frequently simply masks other serious psychological difficulties which require distinct and separate treatment from the substance abuse.

Consider the very situation present in *S.J.* (T.J., appellant)—namely, shortly after the child's birth, the State alleged the child was born with cocaine in her system, and the trial court temporarily placed the child in an agency's custody as a result of a shelter care hearing. After later adjudicating the child neglected, the court ordered DCFS to conduct an investigation and make a report for the court's use at the dispositional hearing. At that hearing, the court learned from the DCFS report that the mother had other serious parental deficiencies, such as abuse of alcohol and marijuana, wholly inadequate parenting skills, and deplorable home conditions. Assume that none of this was known to the court (or the State's Attorney or DCFS, for that matter) at the time the child at issue (S.J.) was born with cocaine in her system. Thus, the neglect petition the State filed—which was the sole basis for the court's taking custody of the child from the mother at the shelter care hearing—mentioned only that the child was born with cocaine in her system and did not refer to the other parental deficiencies revealed for the first time in the DCFS report. Under these circumstances, should the trial court be able to remediate *only* the mother's cocaine abuse while ignoring her other serious parental deficiencies? In our judgment, this cannot be so, and we reaffirm what we wrote in *L.L.S.*:

"A parent is not divisible into neat compartments; a child who is placed into a parent's custody 'gets the whole package,' and a court is duty bound to ensure that serious parental deficiencies of *whatever nature* have been corrected before the court permits one of its wards to be returned to that parent's custody." (Emphasis added.) *L.L.S.*, 218 Ill. App. 3d at 464, 577 N.E.2d at 1389.

In support of our rejection of the second district's view of reasonable progress and reaffirmance of *L.L.S.*, we note that section 2—21 of the Act provides that to assist the trial court in making determinations at the dispositional hearing (including whether it is in the best interests of the child and the public that the child be made a ward of the court), the court may order that an investigation be conducted and a dispositional report be prepared. 705 ILCS 405/2—21(2) (West 1994). This section does not limit the scope of the investigation and dispositional report to those conditions that led to the child's initial removal. Instead, section 2—21(2) of the Act provides that the trial court may order that a dispositional report be prepared:

"concerning the minor's physical and mental history and condition, *family situation and background*, economic status, education, occupation, history of delinquency or criminality, personal habits, and *any other information that may be helpful to the court.*" (Emphasis added.) 705 ILCS 405/2—21(2) (West 1994).

Moreover, we note that the trial court's responsibility with regard to the question of custody does not end with the dispositional hearing. To prevent children from having to remain indefinitely in foster care, the legislature has recently mandated that the juvenile court conduct permanency review hearings no less than every six months for each child who has been removed from the custody of his or her biological parents. Public Act 90—28 (Pub. Act 90—28, § 10—20, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1792, 1846-48 (West), amending 705 ILCS 405/2—28(2) (West 1996)). Section 2—28(3)(a) of the Act requires the juvenile court to address the question of custody at each permanency review hearing. 705 ILCS 405/2—28(3)(a) (West 1996).

Indeed, the legislature has been so concerned about eliminating the problem of children languishing in foster homes as a result of juvenile court proceedings removing them from their parents' custody that it *twice* amended section 2—28(2) of the Act within the last six months. Public Act 90—27, approved June 25, 1997 (Pub. Act 90—27, § 30, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1742, 1778 (West)), amended section 2—28(2) of the Act to require that the public agency that is the custodian of the child in question must prepare a written report for the permanency review hearing that must "detail what progress or lack of progress the parent has made in correcting the conditions requiring the child to be in care; whether the child can be returned home without jeopardizing the child's health, safety, and welfare, and if not, what permanency goal is recommended to be in the best interest of the child, and why the other permanency goals are not appropriate."

Public Act 90—28, approved June 25, 1997 (Pub. Act 90—28, § 10—20, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1792, 1847 (West)), also amended section 2—28(2) of the Act by adding the following:

"The agency's written report must explain why the child cannot be returned home without jeopardizing the child's health, safety[,] and welfare and why termination of parental rights or private guardianship is not in the best interests of the child. The caseworker must appear and testify at the permanency hearing."

We note that both of these Public Acts also add many other provisions to section 2—28 of the Act, all of which are designed to strengthen the trial court's permanency determination.

■ We also find support for our holding in the most recent legislative amendments to section 1 of the Adoption Act. Section 1(D)(m) of the Act was revised in Public Act 90—27 (Pub. Act 90—27, § 45, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1742, 1784 (West)) and Public

Act 90—28 (Pub. Act 90—28, § 10—25, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1792, 1858 (West)) (amending 750 ILCS 50/1(D)(m) (West 1996)), which together added the following emphasized language:

"(m) Failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent within 9 months after an adjudication of neglected or abused minor under Section 2—3 of the Juvenile Court Act of 1987 or dependent minor under Section 2—4 of that Act. If a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care within 9 months after the adjudication under Section 2—3 or 2—4 of the Juvenile Court Act of 1987."

Thus, section 1(D)(m), as amended, provides that "failure to make reasonable progress toward the return of the child to the parent" includes *both* the parent's failure to substantially fulfill his obligations under the service plan *and* the parent's failure to correct the conditions that led to the minor child's initial removal. Pub. Act 90—27, § 45, eff. January 1, 1998 (1997 Ill. Legis. Serv. 1742, 1784 (West)).

In addition, we note that section 8.2 of the Abused and Neglected Child Reporting Act (Reporting Act) sets forth what a service plan may entail, providing as follows:

"No service plan shall compel any child or parent to engage in any activity or refrain from any activity which is not *reasonably related to remedying a condition or conditions* that gave rise or *which could give rise to any finding of child abuse or neglect.*" (Emphasis added.) 325 ILCS 5/8.2 (West 1994).

Reading section 1(D)(m) of the Adoption Act and section 8.2 of the Reporting Act together, these sections (1) indicate that the legislature has quite understandably provided that the measure of reasonable progress encompasses those conditions which *could give rise* to a finding of abuse or neglect (not merely those conditions which led to the initial removal of the minor child); and (2) support our rejection of *S.J.* (T.J., appellant) and the reaffirmance of our holding in *L.L.S.* that "the standard by which progress is to be measured is parental compliance with the court's directives, the service plan, or both" (*L.L.S.*, 218 Ill. App. 3d at 463-64, 577 N.E.2d at 1389).

As this discussion demonstrates, trial courts in juvenile proceedings must continuously revisit the question of custody. Each time the court does so, it has the option of either returning custody to the parent, continuing custody of the child in the agency, or removing custody of the child from a parent and placing the child in the custody of an agency. This carefully constructed statutory scheme demonstrates the erroneous premise of *S.J.* (T.J., appellant)—namely, that the court removes custody from a parent at a single, identifiable moment of the juvenile court process, and that moment forever freezes the issues which a parent must address in order to make reasonable progress to obtain the return of the child's custody.

## C. Parental Unfitness

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

## III. CONCLUSION

For the reasons stated, we dismiss respondents' appeal of the trial court's June 1995 and September 1995 orders and otherwise affirm the court's judgment.

Appeal dismissed in part and affirmed in part.

COOK and GREEN, JJ., concur.