*In re* S.W., a Minor (The People of the State of Illinois, Plaintiff-Appellee, v. C.D., Defendant-Appellant).

First District (4th Division)   No. 1—02—0962

Opinion filed July 31, 2003.

Rita A. Fry, Public Defender, of Chicago (Eun W. Cho, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Kisicki, and Mary C. Joly, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Kass A. Plain, of counsel), guardian *ad litem*.

JUSTICE HARTMAN delivered the opinion of the court:

Following an adjudicatory hearing, the circuit court found that the minor, S.W. (born July 6, 1989), was dependent through no fault of her

mother, defendant C.D. See 705 ILCS 405/2—4(1)(c) (West 2000). After a dispositional hearing, S.W. was adjudged a ward of the court and placed in the guardianship of the Department of Children and Family Services (DCFS). On appeal, defendant contends that (1) the court's dependency finding was against the manifest weight of the evidence and (2) the court failed to comply with the statutory time limit for conducting the adjudicatory proceeding.

On August 3, 2001, the State filed a petition for adjudication of wardship and a motion for temporary custody for S.W., alleging *inter alia* that defendant was unable to provide the care necessary for the minor's well-being through no fault of the defendant. On August 7, 2001, the court found probable cause and temporary custody was awarded to DCFS due to defendant's inability to care for S.W.

On September 19, 2001, N.W., S.W.'s father, was served with notice of the petition.[1] On October 2, 2001, N.W. entered his appearance and a formal paternity finding was entered. On October 2, 2001, all parties agreed to waive the statutory time limit for the adjudicatory hearing.

On February 19, 2002, the State moved to dismiss the petition for adjudication of wardship and the guardian *ad litem* objected. Following a "J.J. hearing,"[2] the court denied the motion, finding it was in the best interests of S.W. that the petition not be dismissed. At the end of the hearing the court, on its own motion and over defendant's objection, continued the matter for adjudicatory hearing within 30 days. During the February 19, 2002, proceedings, the court summarized a prior court proceeding stating "mother did not waive the 90 days on the last court date; and, therefore the 90 days will be up either today or tomorrow." The record on appeal contains no reports of proceedings for any court dates prior to February 19, 2002.

An adjudicatory hearing was held on March 1, 2002. DCFS child protection specialist Charles Dorothy testified that on August 1, 2001, he received a hot line report that defendant and S.W. were at the emergency room at Evanston Hospital and defendant was refusing to take S.W. home with her. After seeing S.W. at the hospital, he described her as clean, well-fed, and with no visible signs of abuse or neglect. When asked why she took S.W. to the hospital, defendant responded that S.W. was out of control, would not listen, and was hitting

---

[1]N.W. is not a party to this appeal.

[2]This refers to *In re J.J.*, 142 Ill. 2d 1, 566 N.E.2d 1345 (1991), which holds that when the State moves to dismiss a petition for adjudication of wardship, the juvenile court judge must consider the merits of the motion and determine, on the record, whether dismissal is in the best interests of the minor, the minor's family, and the community.

defendant. Defendant explained that she wanted to get more structure for S.W. than she could provide in the home.

Defendant indicated that S.W. was being seen by the social worker at her school and that there was a behavior specialist from Little City Foundation coming to the home once a week. Defendant stated that S.W. previously had been hospitalized on numerous occasions for psychiatric reasons. Dorothy explained to defendant that his intent was to work with her to make an alternative plan for S.W. and to try to avoid taking protective custody. Dorothy also spoke to N.W. at the hospital, who indicated that he was not able to care for S.W. and that he had no family members who could care for her. Prior to Dorothy's arrival at the hospital, S.W. had been assessed and it was determined that she would not be hospitalized.

While at the hospital, Dorothy had a telephone conversation with a youth officer at the Evanston police department who suggested that Dorothy bring S.W. and defendant to the police station. After discussions at the police station, it was determined that S.W.'s problems needed to be dealt with by DCFS.

Dorothy then took S.W. and defendant to Chicago Lakeshore Hospital in an attempt to have S.W. hospitalized rather than take protective custody. S.W. was assessed and it was determined that she would not be hospitalized. Defendant still indicated that she would not allow S.W. to return home with her that night. Dorothy then took protective custody of S.W. He stated that lockout was the only reason protective custody was taken and that if defendant had agreed to take S.W. home on August 1, 2001, he would have allowed her to do so.

Dorothy noted that while in the car traveling from Evanston Hospital to the Evanston police station, defendant asked to stop at her bank. While defendant was in the bank, S.W. became agitated because her favorite television program was about to start and she wanted to go home. S.W.'s brother was able to calm her down. When defendant returned to the car there was a physical exchange between S.W. and defendant in which S.W. tried to hit defendant. Defendant was able to calm S.W. down quickly.

Dorothy testified that based on defendant's assertion that she would not allow S.W. to return home because she could not control S.W., it was his opinion that defendant could not care for S.W. According to Dorothy, after August 1, 2001, defendant never stated that she wanted S.W. to come home. On August 7, 2001, defendant indicated that she wanted S.W. to be taken out of the system and to go stay with a cousin.

The State presented S.W.'s medical records from Evanston Hospital, Chicago Lakeshore Hospital, and Riveredge Hospital. The

Riveredge Hospital records indicated that S.W. was hospitalized from June 17, 2001, through July 3, 2001, due to "aggressive destructive behavior and attempting to kill her mother." S.W. was diagnosed with intermittent explosive disorder, attention deficit hyperactivity disorder, pervasive developmental disorder, and mild to moderate mental retardation.

The Evanston Hospital records show that S.W. was seen on April 2, 2001, due to aggressive behavior. S.W. was again seen in the emergency room on June 17, 2001, due to agitation and combative behavior. C.D. told hospital personnel at that time "I cannot control her." S.W. was seen again in the emergency room on July 12, 2001, when it was determined that she needed to be hospitalized for an oppositional defiant disorder. She was transferred to Chicago Lakeshore Hospital, where she was admitted due to aggressive behavior.

Defendant unsuccessfully moved for a finding. The guardian *ad litem* then presented the following evidence.

Caryn Adolph, a case coordinator at Little City Foundation, testified that she was assigned to S.W.'s case in February 2001. At a February or March 2001 meeting, defendant indicated her difficulty in caring for S.W. at home due to S.W.'s behavior issues, aggression, and developmental delays. Little City Foundation provided a direct care staff person who worked in the home 15 hours per week. According to Adolph, from March through July 2001, defendant requested residential placement for S.W. Adolph further stated that sometime in July 2001, she suggested that Little City Foundation possibly could provide a behavior specialist to come to the home. Defendant initially met with the behavior specialist on July 26, 2001. A subsequent meeting set for August 1, 2001, was not kept.

Cynthia Bradley testified that she was S.W.'s case manager at Maryville Academy, Eisenberg Campus, where S.W. was residing and receiving 24-hour-a-day care. Bradley had observed S.W. exhibit aggressive behavior. On one occasion S.W. attempted to take a chair from another resident's room. When staff locked the door to the room, S.W. became upset, pushed, shoved and kicked staff, and had to be restrained. On another occasion S.W. refused to leave a staff member alone and began kicking the staff member when S.W. became fixated on something the staff member was wearing. Bradley also described situations where S.W. put her own safety at risk. According to Bradley, S.W. is unable to take care of her own hygiene needs. According to Bradley, based on her observations, S.W. requires residential care.

Defendant testified on her own behalf that prior to August 7, 2001, she told Dorothy that she wanted S.W. back home with her and that this was still her desire. She admitted on cross-examination,

however, that she told Dorothy on August 1, 2001, that she could not take care of S.W. She also told the Evanston police youth officer that she would not take S.W. home on August 1, 2001.

The circuit court entered a finding of no-fault dependency. See 705 ILCS 405/2—4(1)(c) (West 2000).

A dispositional hearing was held on March 29, 2002. Sunny Ulaheannan, a DCFS child care specialist assigned to S.W.'s case, testified that DCFS should be appointed guardian of S.W. because S.W. has extreme special needs and defendant is not able to meet those needs on her own. He also stated that defendant had completed a parenting class and psychological evaluation. According to Ulaheannan, defendant has never missed a visit with S.W. Sue Atkins, a clinical therapist at Maryville Academy, testified that S.W. has made a great deal of progress while at Maryville, but could never be placed in a home environment because she will always be at risk of harming herself.

The circuit court adjudged S.W. a ward of the court, finding that defendant was unable to care for, protect or train S.W.[3] The court removed S.W. from the custody of her parents and appointed a guardian.[4]

I

Defendant first contends that the circuit court's finding that S.W. was dependent through no fault of the mother was against the manifest weight of the evidence.

By statute, a dependent minor is any minor under 18 years of age "who is without *** other care necessary for his or her well being through no fault, neglect or lack of concern by his parents." 705 ILCS 405/2—4(1)(c) (West 2000). Dependency need only be proved by a preponderance of the evidence. *In re A.D.W.*, 278 Ill. App. 3d 476, 663 N.E.2d 258 (1996) (*A.D.W.*). The circuit court's determination of dependency will not be overturned unless it is manifestly erroneous. *A.D.W.*, 278 Ill. App. 3d at 482. The best interest and welfare of the minor is the standard applicable to proceedings under the Act. *In re Stilley*, 66 Ill. 2d 515, 363 N.E.2d 820 (1977). A court's finding is against the manifest weight of the evidence if a review of the record clearly shows that the opposite result would be the proper one. *In re J.J.*, 246 Ill. App. 3d 143, 615 N.E.2d 827 (1993).

The evidence at the adjudicatory hearing established that S.W. had

---

[3]The circuit court also found that N.W., the father, was unable and unwilling to care for, protect or train S.W.

[4]The matter was continued for a permanency planning hearing on September 25, 2002.

been diagnosed with intermittent explosive disorder, attention deficit hyperactivity disorder, pervasive developmental disorder and mild to moderate mental retardation. She had been hospitalized several times for emotional and psychological problems. On August 1, 2001, defendant refused to allow S.W. to return home. Defendant admitted at the hearing that she told Dorothy on August 1, 2001, that she could not take care of S.W. She further admitted telling an Evanston police youth officer that she would not take S.W. home with her on August 1, 2001. Dorothy testified that defendant's refusal to take S.W. home on August 1, 2001, was the only reason protective custody of S.W. was taken.

Citing no authority, defendant argues that the circuit court's dependency finding incorrectly was based on the situation at the time the adjudication petition was filed and not on the situation as it stood at the time of the adjudicatory hearing on March 1, 2002. According to defendant the court "deliberately chose to disregard relevant information, which had been accumulated since [the] August 1, 2001 incident" and "chose to ignore the circumstances surrounding the case at the time of the adjudicatory hearing." Specifically, the court did not consider that C.D. submitted to DCFS-required services, completed parenting classes, and regularly called and visited S.W. Defendant seems to confuse the adjudicatory hearing and the dispositional hearing. The above evidence was adduced during the dispositional hearing, after the finding of dependency already had been made. It should be noted that defendant's sole argument is that the finding of dependency was against the manifest weight of the evidence.

Our supreme court recently stated:

"[E]vidence that a parent substantially completed offered services, or otherwise refrained from prior objectionable conduct following removal of the child, does not somehow absolve or erase the parent's initial failing that triggered State intervention and removal of the child. Rather, such evidence is appropriately considered at the second stage of the termination hearing, at which the court considers whether it is in the best interest of the minor that parental rights be terminated. At that time, the full range of the parent's conduct can be considered." *In re C.W.*, 199 Ill. 2d 198, 217, 766 N.E.2d 1105 (2002) (*C.W.*).

Although dealing with a termination hearing, *C.W.* suggests that evidence regarding defendant's subsequently completed services and her subsequent behavior properly was considered at the dispositional hearing, not the adjudicatory hearing.

The circuit court's dependency determination was not against the manifest weight of the evidence.[5]

## II

Defendant next contends that because the circuit court failed to comply with the statutory time limit for conducting the adjudicatory proceeding, it lacked statutory authority to proceed. See *In re C.S.*, 294 Ill. App. 3d 780, 691 N.E.2d 161 (1998).

■ Illinois recognizes that "serious delay in the adjudication of abuse, neglect, or dependency cases can cause grave harm to the minor." 705 ILCS 405/2—14(a) (West 1996) (section 2—14). Section 2—14(b) of the Act (705 ILCS 405/2—14(b) (West 1996)) provides: "When a petition is filed alleging that the minor is abused, neglected or dependent, an adjudicatory hearing shall be held within 90 days of the date of service of process upon the minor, parents, any guardian and any legal custodian." Section 2—14(c) of the Act (705 ILCS 405/ 2—14(c) (West 1996)) (section 2—14(c)) provides in part that "[u]pon written motion of a party filed no later than 10 days prior to hearing, or upon the court's own motion and only for good cause shown, the Court may continue the hearing for a period not to exceed 30 days, and only if the continuance is in the best interests of the minor."

■ Defendant has waived this issue by failing to move, either orally or in writing, to dismiss the petition in the circuit court. According to the State and the public guardian, nothing in section 2—14 provides for the automatic dismissal of a petition if the adjudicatory hearing is not held within the statutory time period.

In interpreting a statute, the primary objective is to ascertain and give effect to the intent of the legislature. *In re S.G.*, 175 Ill. 2d 471, 677 N.E.2d 920 (1997) *(S.G.)*. The best indicator of legislative intent is the language of the statute. *S.G.*, 175 Ill. 2d at 480. Section 2—14(c) provides that "[i]f the adjudicatory hearing is not heard within the time limits required by subsection (b) or (c) of this Section, *upon motion by any party* the petition shall be dismissed without prejudice." (Emphasis added.) 705 ILCS 405/2—14(c) (West 1996). The clear language of the statute provides that the petition shall be dismissed "upon motion by any party." In the present case, neither defendant nor any other party moved to dismiss the petition on the grounds that section 2—14 was not complied with.

Section 2—14 makes clear that its purpose "is to insure that *** the State of Illinois will act in a just and speedy manner to determine

---

[5]Because the circuit court's dependency finding is affirmed, the public guardian's alternative argument that S.W. should be found neglected due to lack of necessary care need not be considered.

the best interests of the minor." 705 ILCS 405/2—14(a) (West 1996). To allow defendant to raise this issue for the first time on appeal would be contrary to this stated purpose.

For the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GREIMAN and KARNEZIS, JJ., concur.